**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JAN 1 4 2015

JAMES W. McCORMACK, CLERK

By: _____
DEP CLERK

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS

| | |
|---|---|
| **KENNY FALWELL and EAGLE LAKE FARMS, individually and on behalf of a Class of others similarly situated,** | **DEMAND FOR JURY TRIAL** |
| **Plaintiffs;** | **Civil Action No.** 3:15cV12- DPM |
| **v.** | |
| **SYNGENTA CORPORATION, SYNGENTA CROP PROTECTION, LLC, SYNGENTA SEEDS, INC. , MICHAEL MACK, and DAVID MORGAN** | This case assigned to District Judge  **Marshall** and to Magistrate Judge **Deere** |
| **Defendants.** | |

---

## CLASS ACTION COMPLAINT

---

## TABLE OF CONTENTS

NATURE OF THE CASE ................................................................................................ 4

JURISDICTION AND VENUE ...................................................................................... 14

PARTIES ........................................................................................................................ 14

    Plaintiffs ................................................................................................................ 14

    Defendants ............................................................................................................. 15

FACTUAL ALLEGATIONS                                                     17

    The Market for United States Corn ........................................................................ 17

    Syngenta Knew That China was Projected to Be One of the Top U.S. Export Markets ... 18

    Essential Need for High Standards of Purity and Integrity ................................... 20

    Defendants Were Acutely Aware of Growing Resistance Toward GMO Corn ............... 21

    Syngenta's Genetically Modified Corn — Agrisure VIPTERA™ .................................... 26

    Syngenta Seeks Regulatory Approval for MIR-162 "Trait Stock" from China ............... 27

    Defendants' Scheme Directly Harming U.S. Corn Growers: Premature
    Market Release of MIR-162 Seed ......................................................................... 29

    China's Rejection of U.S. Corn and Protests by Other Relevant Entities ................... 43

    Massive Damages to the U.S. Corn Market. ......................................................... 49

CASS ACTION ALLEGATIONS                                         51

    Nationwide Class: ................................................................................................. 51

CLAIMS FOR RELIEF .................................................................................................. 54

    COUNT I VIOLATIONS OF THE RACKETEER INFLUENCED AND
    CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §1962(a)-(d) ..................................... 54

    The RICO Enterprise ............................................................................................ 55

    Predicate Acts ....................................................................................................... 59

    COUNT II PUBLIC NUISANCE ........................................................................ 63

    COUNT III TRESPASS TO CHATTELS ........................................................... 64

    COUNT IV COMMON LAW NEGLIGENCE ................................................... 65

    COUNT V STRICT LIABILITY – PRODUCTS LIABILITY ............................. 66

    COUNT VI STRICT LIABILITY – FAILURE TO WARN ................................. 67

COUNT VII TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS
RELATIONSHIPS ...........................................................................................68

REQUEST FOR RELIEF ..........................................................................................69

DEMAND FOR JURY TRIAL ..................................................................................71

This is a lawsuit against Syngenta Seeds, Inc. (a Delaware Corporation), Syngenta AG (a Swiss Corporation), Syngenta Corporation (a Delaware Corporation), Syngenta Crop Protection LLC (a Delaware Corporation), (collectively "Syngenta"), Syngenta's Chief Executive Officer and Chairman of the Board, Michael Mack ("Mack"), Syngenta Seeds President and Regional Director for North America (until August 2014) and David Morgan (collectively "Defendants"), on behalf of Plaintiffs Kenny Falwell and Eagle Lake Farms, and all other similarly situated corn growers in the United States who did not purchase or otherwise plant or grow Syngenta's corn seed product containing MIR-162 trait and suffered damages caused by Defendants' actions as more fully alleged herein. Plaintiffs seek to recover damages sustained as a direct and proximate consequence of Defendants' fraudulent scheme and intentional acts successfully disrupting and damaging the U.S corn market for their own pecuniary goals. The facts and information alleged herein are based upon Plaintiffs' personal knowledge and belief as to Plaintiffs, and upon information and belief as to all other allegations. Plaintiffs believe that further substantial evidentiary support for the allegations herein will exist after a reasonable opportunity for further investigation and discovery. In support of this Complaint against Defendants, Plaintiffs alleges upon information and belief the following:

## NATURE OF THE CASE

1.      Plaintiffs and all other similarly situated members of the putative class are corn growers in the United States ("U.S.") who did not, purchase, or otherwise plant or grow Syngenta's corn seed product containing MIR-162 genetic trait. Corn grown in the United States ("U.S. Corn") is a significant commodity, much of which — approximately 20% — is exported to foreign nations. The U.S. is the largest exporter of corn in the world. Many of the world's nations rely on

the U.S. to produce and sell to them sufficient quantities of corn so that they can feed their human population and livestock, or produce ethanol.

2.      This is particularly true of China that has a population exceeding one billion people. By the 2011-2012 growing season, China had purchased five million metric tons of U.S. corn. China was poised and projected to increase its projected reliance on U.S. corn from that point forward after virtually negligible purchases in 2000-2008 and modest purchases in 2009-2010.

3.      Prior to 2009, genetically modified ("GMO") corn had gained increasing traction with U.S. corn growers for both the domestic and export corn markets, with increasing acceptance in the domestic marketplace. However, commencing approximately 2009 and thereafter, GMO corn as a percentage share of total U.S. corn acreage began to flatten as there was a significant trend among consumers and, consequently, domestic corn growers, away from the use of GMO corn amid a broader, continuingly increasing insistence on the use of corn that was not grown from genetically modified seeds or seeds containing unapproved genetic modifications or "traits." This ever-increasing attitude among U.S. corn growers and end-users — including large food companies and grain elevators — was co-extensive with the resistance to and disapproval of GMO corn or unapproved trait stack GMO corn among foreign nations in the U.S. corn export market. And non-GMO corn increasingly became in high demand, with more and more consumers becoming concerned with or otherwise more aware of the potential risks and dangers associated with corn grown from genetically modified seed traits.

4.      In 2010, Syngenta launched a marketing effort to sell GMO corn to U.S. seed farmers that was not approved by several countries importing U.S. corn and its by-products. Syngenta labeled such seed product Agrisure® VIPTERA™ with genetic trait MIR-162 ("VIPTERA"). VIPTERA is different from traditional corn varieties in that it is a federally

registered pesticide, and farmers growing it must necessarily adhere to specific stewardship procedures.

5.      A number of major countries to which U.S. corn was exported had banned GMO corn grown from GMO seeds including Syngenta's VIPTERA containing the MIR-162 genetic trait. And after the 2010-2011 season, China, which had previously accepted some U.S. corn containing MIR-162 genetic trait, adopted a "zero tolerance" policy with respect to GMO corn containing MIR-162 genetic trait. By April 2012, China still had not approved MIR-162 genetic trait after Syngenta initially sought its regulatory approval in 2010. And certain member states of the European Union also did not approve Syngenta's VIPTERA.

6.      During the 2011/2012 growing season, and faced with the marketplace reality that consumers were increasingly moving away from GMO corn, Bunge North America, Inc., ("Bunge"), one of America's largest grain elevator operators, would not agree to handle and store VIPTERA corn. Major export markets were increasingly unwilling or otherwise continued to be reticent to approve the importation of such corn containing genetic trait MIR-162 into their countries and, instead, were insistent on importing non-GMO corn, or non-MIR-162 genetic trait corn. In or about July 2011, Bunge, with over sixty grain elevators stretched throughout the heart of the U.S., notified farmers that it would refuse to accept delivery of corn products grown from "Agrisure® VIPTERA™ - MIR-162 (Syngenta)," because such seed product had not received necessary international approval from major export destinations. Bunge's efforts to protect the U.S. corn supply from MIR-162 contamination — especially with regard to China — was met with stiff resistance from Defendants. Syngenta commenced suit against Bunge in 2011 seeking injunctive relief. In the Fall of 2011, Syngenta's effort to enjoin Bunge's refusal to accept handling and storage of VIPTERA corn containing the MIR-162 genetic trait was denied.

7.     U.S. Corn growers understandably became even more interested in maintaining the purity of U.S. corn free of unapproved GMO traits — a purity for which U.S. Corn growers had maintained a significant reputation for many years.  Fear of contamination of the U.S. Corn supply was well known to the Defendants.  Syngenta needed the continuing and increasing acceptance by U.S. Corn growers of Syngenta's genetically modified corn seed, particularly including, but not limited to, its corn seed containing MIR-162 genetic trait.  But continuing anti-GMO trends presented a significant problem for Syngenta in the event that non-GMO corn growers in the United States and U.S. Corn farmers who were reticent to plant corn seeds containing unapproved genetic traits such as MIR-162, established and maintained such a dominant foothold in the U.S. corn market — particularly with respect to exports to China, an increasingly larger purchaser of U.S. corn — that growers of Syngenta's genetic trait MIR-162 GMO corn would elect to grow non-GMO or non-MIR-162 genetic trait corn in the future. If that occurred, it would weaken Syngenta competitively, reversing its economic growth and momentum and potentially disabling it from recovering the approximately $200 million it had invested in VIPTERA's development over a span of five to seven years.

8.     Hence, in response to greater resistance to GMO corn both domestically and abroad — especially corn containing unapproved genetic traits like MIR-162— Defendants embarked on a plan to purposely undermine U.S. non-GMO corn growers and those resistant to growing Syngenta's unapproved genetic corn traits.  To that end, Defendants engaged in a scheme designed to inevitably taint and contaminate the U.S. Corn supply, effectively causing its economic vitality to be held hostage to MIR-162 trait GMO corn, knowing that the continuous marketing and sale of Syngenta's MIR-162 trait corn seed would ultimately prejudice and disrupt the U.S. Corn export market and the U.S. Corn commodities market.

9.     Knowing full well that it was impossible for farmers to keep VIPTERA'S MIR-162 genetic trait from comingling with non-GMO corn or otherwise contaminating the U.S. corn supply and market, as more fully explained below. Defendants exploited that biological and practical reality, deceptively marketing Syngenta's VIPTERA product containing MIR-162 through Syngenta's associations with independent dealers and a network of independent so-called "Syngenta Seed Advisors" who partnered with Syngenta. Defendants recognized and expected that once VIPTERA seeded corn was grown in the U.S., Syngenta's MIR-162 genetic trait would ultimately infiltrate and thereby "taint" or "contaminate" enough of the U.S. Corn supply — especially corn exported to China, which had a "zero tolerance" policy — that China and other export nations would be faced with a Hobson's choice:  reject U.S. corn tainted with MIR-162 genetic  trait and take a chance on securing other viable trade partners, failing which that nation would risk lacking sufficient corn to feed its people and livestock, or, rather than accept such risk, feel compelled to accept delivery of U.S. Corn. Defendants' scheme also had one further important goal:  stalling or thwarting the trend towards non-GMO corn by repeatedly demonstrating the ability to so contaminate U.S. Corn with Syngenta's GMO corn, including MIR-162, that U.S. Corn farmers would be forced by that reality and market economics to embrace GMO, including Syngenta's MIR-162 trait corn, since to resist doing so would be futile and perhaps even economically disadvantageous in the long term.

10.     Defendants, through the Syngenta GMO Corn Seed Enterprise which they managed and controlled, aggressively marketed Syngenta's VIPTERA corn seed containing MIR-162 for sale to U.S. corn growers, utilizing false and deceptive marketing and sales materials and public statements, which were disseminated through the instrumentalities of interstate commerce, including the mail, electronic wire and the internet, in order to induce U.S. Corn growers to

advocate, embrace, purchase and/or grow VIPTERA's MIR-162 genetic trait seed, (and thereafter
Syngenta's DURACADE corn seed containing MIR-162 trait stacks) and thereby effectuate
Defendants' scheme.

11.     As an important step in Defendants' scheme continuing from at least April 2011,
thousands of farmers across the United States were induced to purchase, plant and grow Syngenta's
VIPTERA seed containing MIR-162 trait, simultaneously becoming unwitting vehicles by which
genetically modified corn trait MIR-162 would, by reason of the manner in which corn pollinates,
infiltrate non-MIR-162 genetic trait corn fields of other growers.  And since 2014, many more
were induced to purchase DURACADE with similar contaminating results.

12.     Just as it had done in 2011 in its effort to induce the court to enjoin Bunge,
Syngenta's marketing to U.S. Corn growers deceptively downplayed the significance of China as
a U.S. partner, in stark contrast to what Defendants internally knew to be true:  that China was
forecasted to have a significant impact on world markets, with increasing imports of U.S. Corn.
In 2011, Syngenta falsely informed the United States District Court in the Bunge proceedings that
it anticipated receiving approval for MIR-162 from China by March 2012.  On April 18, 2012, in
a publicly disseminated earnings conference call reporting on Syngenta's first quarter 2012 results,
Syngenta CEO Michael Mack misled the entire grain industry to believe that approval of MIR-162
by China was imminent while he and Syngenta were promoting VIPTERA stating: "[t]here is an
outstanding approval for China, which we expect to have quite frankly within the matter of a
*couple days* … that remains on track for approval … we know of no issue with that whatsoever
…" Defendant Mack's statement was false and was designed to and did encourage farmers to
plant, grain elevators to accept and commingle, and exporters to purchase and ship VIPTERA.
Syngenta's marketing materials and so-called "Right to Grow Program" concealed the fact that

China was refusing to approve MIR-162 genetic trait corn in part because Syngenta had, since 2010, failed to provide adequate or complete data supporting approval. Neither did Syngenta's marketing materials and advertisements or communications disseminated to U.S. Corn growers and the commodities market — whether by mail or electronic wire or in person — disclose Syngenta's plan and scheme to use U.S. farmers purchasing MIR-162 trait corn, grain elevators, and shippers, to effectively contaminate the U.S. Corn supply in order to thereby disrupt the U.S. Corn market, stall or thwart the continuing advance of and market share gains achieved by non-GMO corn, or force export notions such as China to accept corn containing MIR-162 trait.

13.     Defendants knew that marketing VIPTERA, (and later DURACADE) prior to regulatory approvals from major U.S. export markets such as China and the European Union was reckless and irresponsible at best, contrary to the advices and comments of key major industry trade organizations — one of which Syngenta is a member — and lacking consent from Bunge, a major grain storage and handling enterprise. But Defendants did not care, nor did they insist upon or implement strong and effective measures and controls to safeguard the U.S. Corn supply from being commingled with and contaminated by MIR-162 genetic trait VIPTERA. Relying on the biological manner by which GMO corn pollinates and consequently contaminates non-GMO corn grown in the United States, the Defendants made no effort to provide its VIPTERA corn seed growers with "grain cocoons," compel them to set barriers, or take other meaningful precautions against their VIPTERA seeded corn containing MIR-162 genetic trait from tainting non-GMO corn fields, or otherwise becoming comingled with non-GMO corn in the process of harvesting, storing, handling or exporting it to its final markets.

14.     At all times material, Defendants realized that the direct victims of their scheme were U.S. Corn farmers, including those such as Plaintiffs, who either grew non-GMO corn or

otherwise did not purchase Syngenta's VIPTERA or DURACADE corn seed containing MIR-162 trait. Defendants operated the Enterprise for the purpose of maintaining the vitality of their continuing plan and scheme to ultimately create a *"fait accompli"* through the tainting of the U.S. Corn export market, knowing full well the ultimate consequences of their deliberate actions.

15.     In November, 2013, China rejected delivery of U.S. Corn exports when ports of entry in China found that the U.S. Corn supply had been tainted by the existence of Syngenta's genetically modified MIR-162 trait, a clear violation of China's "zero tolerance" policy. The resulting direct harm of China's rejections of delivery of U.S. Corn that the Defendants knew they were inflicting on such corn growers, and which was proximately caused by their scheme as planned — a depression of prices in the corn and corn commodities market — caused considerable economic damage to U.S. Corn growers. With the U.S. Corn market disrupted and non-GMO or non MIR-162 corn growers damaged, Defendants continued their scheme of undermining and contaminating the U.S. non-GMO or otherwise pure corn supply with Syngenta seeded GMO corn containing MIR-162.

16.     Defendants rejected all pleas from national associations such as the North American Grain Export Association ("NAEGA") and the National Grain and Feed Association ("NGFA") to cease and desist selling VIPTERA containing MIR-162, lest U.S. Corn growers would be further damaged. They continued to sell VIPTERA containing MIR-162 trait. In 2014, despite public out-cry, Defendants further pursued their scheme, aggressively marketing and selling yet another Syngenta corn seed product containing MIR-162 and other genetically modified traits which were not approved by China or other nations — DURACADE. Mindful that their scheme had, as they foresaw, caused the rejection of U.S. Corn exported to China and a resulting disruption of the U.S. Corn market, Defendants thereafter tried to cosmetically camouflage their deceptive attack on U.S.

Corn growers — hypocritically encouraging DURACADE purchasers to become better "stewards" of the DURACADE corn that they were growing so that it would not be comingled with or otherwise taint and contaminate the non-MIR-162 U.S. Corn supply intended for export markets that had not yet approved MIR-162 trait. Meanwhile, Defendant Morgan, Syngenta Seed's Regional Director – North America, speaking in a telephonic interview in March 2014 that was reported over the news wires, gave Syngenta's own false and self-serving rationales for why China was rejecting U.S. corn, while concealing the fact that Syngenta had failed to provide China's Ministry of Agriculture with complete and sufficient data and information regarding MIR-162. Defendants did not want to disclose this adverse truth because to do so would have undermind Syngetna's aggressive sales of MIR-162 trait VIPTERA and DURACADE corn seed and their ongoing pernicious scheme.

17. Syngenta entered into a relationship with Gavilon Grain, LLC ("Gavilon") for the purpose of further inducing farmers to purchase its DURACADE corn seed containing MIR-162 trait by providing them with an outlet by which they could store their corn in Gavilon's grain facilities, ostensibly so that Gavilon would find an appropriate market for the sale of their corn. Syngenta's entering into a relationship with Gavilon was simply another avenue by which the Defendants furthered their scheme, hoping to continuously induce more farmers to purchase and plant Syngenta's MIR-162 genetic trait corn seed, mindful that it was virtually impossible to prevent it from contaminating the U.S. Corn supply.

18. On December 15, 2014, it was reported that China's Ministry of Agriculture finally relented with respect to MIR-162 genetic trait VIPTERA. No such decision however had been made with respect to DURACADE. Meanwhile, thousands and thousands of U.S. Corn growers, who were the intended, direct and foreseeable victims of Defendants' scheme, have suffered

significant damages and lost profits.  And the U.S. Corn expert market has suffered damage to its time-honored reputation for purity.

19.     Damages suffered by U.S. Corn growers have been estimated by the National Grain and Feed Association to be potentially as much as $2.9 billion.  On the other hand, Defendants' sales and marketing strategy secured significant revenue for Syngenta's genetically modified corn seed products, enabled Syngenta to recoup its significant research and development costs associated with VIPTERA estimated at over $200 million, and benefitted the individual defendants and other constituents of the Syngenta GMO Corn Seed Enterprise.  Meanwhile, Syngenta's GMO MIR-162 genetic trait seeded corn grown in the United States continues to infiltrate or otherwise "taint" non-GMO corn products, even as other export nations have continued their ban of such GMO corn or have not approved the MIR-162 trait, and as China still grapples with Syngenta's application for approval of DURACADE.

20.     Plaintiffs are further informed and believes that, while Defendants were effectively destroying the U.S. Corn export market as a result of their continuing scheme adversely impacting thousands of U.S. Corn growers, Syngenta further benefitted financially by engaging in hedging transactions that took advantage of the price of corn in the commodities market that their scheme had impacted.  Now, having ruthlessly proven that non-GMO corn growers will have a very difficult time continuing to produce pristine non-GMO and non-MIR-162 genetic trait corn in the face of the aggressive tactics of a GMO corn seed producer such as Syngenta, and that a continued banning of MIR-162 genetic trait GMO corn seed product by China and other countries cannot be wholly sustained, U.S. non-GMO corn growers exist at the mercy of agricultural giants such as Syngenta more than ever before, as it continues to forcibly colonize non-GMO corn with

genetically modified corn seed and MIR-162 worldwide, in the face of a backlash by consumers against such GMO corn products for health, safety and other reasons.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and §1332 and 18 U.S.C. §1961 *et seq.*, Racketeer Influenced and Corrupt Organizations Act ("RICO"). This Court also has supplemental jurisdiction over Plaintiffs' pendant state law claims under 28 U.S.C. § 1367(a) as they form part of the same case or controversy.

22.     This Court has personal jurisdiction over Defendants because Defendants regularly and systematically conduct business in this District, including the marketing and sale of corn seed to farmers within this District. Defendants are entities that have registered to do business in and are subject to service of process in Arkansas.

23.     Venue properly lies in this District under 28 U.S.C. § 1391(b) and (c), because Defendants have and continue to market, sell, or otherwise disseminate corn in this District.

## PARTIES

**Plaintiffs**

24.     Plaintiffs own and operate corn farming operations in Newport, Jackson County, Arkansas. Plaintiffs have engaged in the business of planting, growing, harvesting, and selling corn. Plaintiffs do not buy MIR-162 seed from Syngenta. Instead, Plaintiffs only buy corn seed that has either not been genetically modified, or corn seed genetically modified with traits approved by all major corn importing countries, including China. Plaintiffs farmed in the State of Arkansas. Plaintiffs' income results from the ultimate sale of corn grown on this farmland.

25.     Plaintiffs have been damaged by: (1) Defendants' release of VIPTERA corn containing MIR-162 genetic trait into the U.S. Corn and corn seed supply pursuant to their scheme

as more fully alleged below, causing depressed prices for all U.S. domestic corn; (2) Defendants'
materially misleading statements relating to the approval status of MIR-162 in China, the impact
the lack of approval would have on the market and concealment of material adverse information,
including Defendants plan and scheme; and (3) Defendants' widespread contamination of the U.S.
Corn and corn seed supply with MIR-162, which foreclosed the United States export market to
China for a continuous period of time through 2014, resultingly leading to lower corn prices per
bushel in the United States market and continuing to adversely impact domestic corn growers.

**Defendants**

26.     Syngenta AG is a global Swiss Agrabusiness headquartered in Basel, Switzerland
that markets seeds and agrachemicals. Syngenta's sales in 2013 were approximately U.S. $14.7
billion. Over half of its sales were in emerging markets. Syngenta is listed on both the Swiss
Stock Exchange and the New York Stock Exchange.

27.     Syngenta's field crops include both hybrid seeds and genetically engineered seeds,
some of which enter the food chain and become part of genetically modified food. According to
Syngenta, in the U.S. their "proprietary triple stack corn seeds expanded to represent around 25%
of units sold." In 2010, the U.S. EPA granted registration approval for insecticidal trait stacks
including Syngenta's AGRISURE VIPTERA™ gene, ("VIPTERA") which offers resistance to
certain corn pests. In 2013, Syngenta's sales from crop protection products accounted for U.S.
$10.923 billion i.e., 74% of total sales. Syngenta professes that its aim is to gain an average 0.5%
market share across its combined businesses targeting an EBITDA margin in the range of 22-24%
by 2015, Cash Flow Return on Investment (CFROI) in excess of 12%, and a continuous increase
in dividends to its shareholders.

28.     Syngenta Seeds, Inc. is a Delaware corporation with its principal place of business in Minnetonka, Minnesota. Syngenta develops and produces agricultural seeds, including, but not limited to, corn and soybean seeds, and in particular VIPTERA and DURACADE. Syngenta Seeds conducts business throughout the United States, including in Illinois. Specifically, Syngenta Seeds sells its agricultural seeds to growers either directly or through a network of dealers and distributors.    At all relevant times, Syngenta Seeds, Inc. and Syngenta AG (collectively "Syngenta") have been unified in interest and ownership. The entities are alter-egos of each other, and they have collectively been run as a single business enterprise. Syngenta Seed, Inc., may be served through its registered agent, The Corporation Company, 124 West Capitol Avenue, Suite 1900, Little Rock, AR 72201.

29.     Syngenta Corporation is a Delaware corporation with a principal place of business at 3411 Silverside Road, #100, Wilmington, Delaware, 19810. Syngenta Corporation may be served through its registered agent, The Corporation Trust Company, 1209 Orange St., Wilmington, DE 19801.

30.     Syngenta Crop Protection, LLC, is a limited liability company organized and operating under the laws of the State of Delaware, with its principal place of business at 410 South Swing Road, Greensboro, North Carolina, 27409. Syngenta Crop Protection may be served through its registered agent, The Corporation Company, 124 West Capitol Avenue, Suite 1900, Little Rock, AR 72201. Collectively, Syngenta AG, Syngenta Seeds, Inc., Syngenta Corporation and Syngenta Crop Protection, LLC are referred to as the "Syngenta Defendants."

31.     Michael Mack ("Mack") is and has been at all times material the Chief Executive Officer ("CEO") and Chairman of the Board of Syngenta AG.  Mack regularly communicates with the Syngenta Defendants and their management and, together with them and the individual

defendants identified herein, managed, operated and controlled the "Syngenta GMO Corn Seed Enterprise" through which they carried out their deceptive scheme to harm U.S. corn growers and the non-GMO and non-MIR-162 corn market.

32.     At all times material, until August 2014, defendant David Morgan ("Morgan"), was the President of and Regional Director – North America for Syngenta Seeds, Inc. Morgan, together with the Syngenta Defendants, CEO Mack and others whose identities will be more fully revealed after discovery managed, operated and controlled the Syngenta GMO Corn Seed Enterprise. Collectively, Mack, Morgan, and the Syngenta Defendants are referred to as the "Defendants."

## FACTUAL ALLEGATIONS

### The Market for United States Corn

33.     The United States is the world's largest producer and exporter of corn. There are more acres of farmland growing corn each year than any other crop in the United States. Total corn exports for the U.S. average roughly 20% of national production which underlines the Nation's capacity to utilize supply. That said, the global demand for corn continues to rise. Over 13 billion bushels of corn — over 35% of the world's corn production — are grown annually in the United States on roughly 95 million acres of farmland.

34.     Roughly 20% of the over 13 billion bushels of corn grown each year are sold for export to foreign countries. The export of U.S. Corn generated close to $18 billion in revenues during the 2011 – 2012 growing season — making it the largest and most important cash crop grown in the United States. For the marketing year October 1, 2012 – September 30, 2013, and according to the U.S.D.A. FAS Grain: World Markets and Trade, January 11, 2013, the U.S. exported 26.8% of total corn exports from one foreign country to another making it the largest corn exporting nation in the world.

**Syngenta Knew that China was Projected to be One of the Top U.S. Export Markets**

35.     One of the major U.S. export markets for corn is China. The Chinese market for

U.S. corn has seen explosive growth since 2009. In 2008, China only imported 47,000 metric tons

of U.S. corn.

36.     But since 2009, it had been rapidly increasing its purchase of U.S. Corn to such an

extent that it became a major export market for U.S. corn, with a significant and rapid increase in

China's importation of corn from the U.S. in the 2011-2012 season: 203 million bushels compared

to 39 million bushels in 2010-2011, according to U.S.D.A. ERS, Feed Outlook, January 15, 2013.

Stated another way, China purchased 5 million metric tons of U.S. Corn in the 2011-2012 season,

as noted below:



See http://online.wsj.com/articles/SB10001424052702303873604579493790405023808 (last

visited Nov. 6, 2014).

37.     Given the size of the Chinese market, the laws of supply and demand drove the

price of U.S. Corn higher.  In the 2011-2012 marketing year, 203 million bushels out of 1.543

billion total exported U.S. Corn bushels were exported to China.  Importantly, China has long been

resistant to new genetically modified crops, and in fact, requires new genetically modified seeds

to be planted in China and generate crops for testing before a new genetically modified seed variety is even eligible for import approval into China. In 2011, China was projected to become one of the top 5 importers of U.S. corn. The National Corn Federation of America has made it clear that "export markets are key drivers of producer profitability…and future economic growth for U.S. agriculture…"

38. Defendants were well aware of the fact that China was becoming a bigger and bigger importer of corn and customer of U.S. Corn exports and the importance of China as an export market for U.S. Corn. In Syngenta's 2010 full year results, defendant and Syngenta CEO Mack stated the Chinese "import requirements alone influence global commodity prices." During Syngenta's 2011 Half Year Earnings Report and conference call on or about July 22, 2011, CEO Mack again commented on the importance of the Chinese market, stating that China "continues to have the greatest impact on world markets, with increasing imports… also now of corn."

39. On October 14, 2011, the *Associated Press* reported the following in an article entitled "Huge China Corn Purchases from U.S. to Impact Prices":

Beijing • China has made one of its biggest-ever purchases of corn on overseas markets, buying 900,000 metric tons of American corn and showing that growing Chinese demand will play an ever larger role in global grain prices.

The country was a net exporter of corn until 2009 but is struggling to keep up with growing demand for the grain — which is mainly used in China as animal feed — as incomes increase and people eat more meat.

The U.S. Department of Agriculture announced that China had made the purchase, which comes despite an expected record grain harvest in China this year. China's corn consumption probably totaled 176 million tons in the crop year that started Oct. 1, 2010, according to the department.

The purchase was necessary to help fill China's dwindling corn reserves, said Hanver Li, chairman of the market research firm Shanghai JC Intelligence Co. Ltd., on Friday.

"China's harvest is up but that will just about satisfy domestic demand and meanwhile reserves are running low so China needs to import corn to build up their stocks," he said.

"In the long run, it should have a pretty big impact on global corn prices," Li said of the growing demand from China.

Corn prices on the Chicago Board of Trade have increased about 70 percent over the past two years, though have eased from near record highs in June.

Li forecast China will import between 7 million to 10 million metric tons of corn over the next 12 months. He repeated a forecast he made last year that China's annual corn imports should climb to as much as 15 million metric tons by 2015.

In the 1990s, China was a major exporter of corn but sales abroad began to fall off after 2003, grinding to almost zero in 2009. Last year, China became a net importer of corn.

Animals account for about 70 percent of corn consumption in China with the rest used to produce alcohol, corn starch and other products. Only a small amount is directly consumed by humans.

**Essential Need for High Standards of Purity and Integrity**

40.     The U.S. Corn marketing system is commodity-based. Hence, corn grown by farmers such as the Plaintiffs and those similarly situated throughout the United States is harvested, gathered, commingled, consolidated, and otherwise shipped from thousands of farms from which it is cultivated, harvested and passed through local, regional and terminal distribution centers.

41.     In order to maintain the stability of the corn marketing system and its integrity, it is essential that the U.S. Corn supply and the U.S. Corn exports maintain the highest standards of purity and integrity.  Prior to the incidents giving rise to this lawsuit, the U.S. Corn market maintained a reputation for such purity and integrity.  In that regard, U.S. growers depended heavily on the exercise of due corporate responsibility by biotechnology providers respecting the timing of product launching commercialization of new genetically modified seed product.

**Defendants Were Acutely Aware of Growing Resistance Toward GMO Corn**

42.    Anti-GMO sentiment has grown around the world.  In 2012, Syngenta was criminally charged in Germany for concealing that its genetically modified corn killed cattle.  In May 2012, Syngenta settled a class-action lawsuit in the United States for $105 million after the discovery of contamination of the drinking supply of millions of Americans in more than two thousand water districts with a "gender bending" herbicide called "Antrazine."

43.    On June 2, 2013, it was reported that Russian leaders expressed concerns regarding the continuing conduct of global seed and biogenetic giants Syngenta and Monsanto in the face of a growing "bee apocalypse."  Russian sources cited allegedly undisputed evidence that a class of neuro-active insecticides chemically related to nicotine known as neonicotinoids are destroying the earth's bee population which, if left unchecked, could destroy the world's ability to grow enough food to feed its population.  In June 2013, the European Commission, evidencing that this grave situation had deepened, instituted a two-year precautionary ban set to begin December 1, 2013 on such "bee killing" pesticides following the lead of Switzerland, France, Italy, Russia, Slovenia and Ukraine, all of whom had previously banned these dangerous and genetically altered organisms from being used on the European continent.  Two of the most feared neonicotinoids that were being banned are "Actera" and "Cruiser" made by Syngenta.

44.    The Defendants recognized at all times material that there was an increasing number of corn growers both in the United States and abroad that were resistant to growing genetically modified organism foods and corn seed even in the face of a consensus that there was a need to produce more food for a growing global population in an environmentally sustainable way.  These sentiments prevailing in the global community were further confirmed after Syngenta commissioned a research firm, Edelman Berland, to conduct global research between July 2-31,

2013 among "informed" members of the public, consisting of college educated, high income and media-engaged individuals.

45.    The Edelman Berland survey reconfirmed the preference for local, organic and urban farming and a desire among respondents specifically to minimize the use of pesticides, fertilizers and genetically modified seeds.  According to the Edelman Berland survey, when responding to the question "do you believe that pesticides, fertilizers, genetically modified seeds, along with other technologies and development, should all be used to meet this growing need for food globally?" a clear majority of those polled in the United States — 66%, while supporting the use of latest technologies in general, did not support the use of pesticides fertilizers and genetically modified seeds.  The great majority of those polled in the U.S. — 65% — believed that less pesticides should be used.  And 41% of those polled in the U.S. believed that less genetically modified seeds should be used versus 36% who believed that more genetically modified seeds should be used.

46.    In response to the question "do you believe that priority should be given to organic, local and/or urban farming practices over higher production methods utilizing new technologies to feed the growing population?" 65% of respondents in the U.S. answered in the affirmative and the vast majority of respondents in every other country surveyed by Edelman Berland also answered in the affirmative, demonstrating a clear preference globally for prioritizing organic, local and/or urban farming practices. Organic farming was viewed particularly favorably, with 62% of U.S. respondents stating that more organic farming should be used and only 13% proclaiming that less organic farming should be used — again, reflecting a significant and evident trend globally with the vast majority of respondents in all the other countries that were surveyed

also stating that more organic farming should be used, while a very small percentage of respondents chose less organic farming.

47.     The growing anti-GMO movement was aided by both foreign nations and domestic food companies. China and Europe were the two entities most responsible for combating what had been a proliferation of genetically altered products.  Whole Foods, Chipotle and General Mills, the makers of Cheerios, also began supporting the anti-GMO battle.

48.     In an article appearing in the *Alternative Daily* on January 18, 2014, entitled "Biotech Companies Fight Against Hawaiian Anti-GMO Law," readers were informed that "[t]he battle rages on between the deep pockets of agribusiness and the resilience and growing numbers of those against the genetic alteration of our food. In a desperate attempt to stop the spread of anti-GMO laws in Hawaii, DuPont, Syngenta and Agrigenetics, Inc. have filed a lawsuit against Kauai's ordinance restricting GMO use.…  Syngenta spokesperson Paul Minehart said, 'the ordinance is invalid. It arbitrarily targets our industry with burdensome and baseless restrictions on farming operations by attempting to regulate activities over which counties in Hawaii have no jurisdiction.'"  Continuing, the article reported, "[h]owever, just because GMOs are federally approved does not make placing restrictions on them 'baseless.' The Institute for Responsible Technology … points to multiple studies that have associated GMOs with major health issues including immune system problems, changes in organ systems including the digestive system, infertility, insulin regulation complications and antibiotic resistance.…   The GMO manufacturers… eventually… will have to concede… the fact that the tides are shifting against them, and realize that more and more Americans want nothing to do with GMOs."

49. On February 24, 2014, *The Motley Fool* reported in an article entitled "<u>More Cracks Appear in GMO Wall</u>:"

> The invincibility of genetically modified crops may be starting to crumble under its own weight, with Syngenta (NYSE: SYT ) being the latest biotech to stress-test their resilience…
>
> Bunge … and Cargill, the biggest U.S. grain exporter, have said they will refuse to accept Syngenta's latest crop of GM corn for export because it will be rejected by China….
>
> This year's crop… hasn't been approved by Europe or China. In December, China refused acceptance of 665,000 metric tons of corn and byproducts because it tested positive for the presence of MIR-162, or Agrisure Viptera, a genetically modified insecticide not approved for import…. last month the National Grain and Feed Association and North American Export Grain Association sent Syngenta a letter asking the company to immediately shut down commercialization of both Agrisure Viptera and the new Agrisure Duracade corn unless and until it gets an international seal of approval….
>
> Interestingly, Syngenta acknowledges that many U.S. grain elevators have long posted signs saying they didn't want to accept Viptera corn, so the biotech says the letters aren't really any new stance by the industry, just a long-held position that it's otherwise chosen to ignore. Yet the backlash against genetic modification of food continues to mount. There's a certain illogic to the notion that we can spray seed with poison that kills everything around it but still allows it to germinate and grow. The resulting crops are also sprayed, only to be harvested, sold, and consumed later on.
>
> Consider France is poised to reimpose a ban on Monsanto's MON 810 maize, and that includes insect-resistant maize developed jointly by DuPont… and Dow Chemical … that the rest of Europe will be forced to accept. Although 19 of the 28 EU members voted against the GM corn, the confederation's weighted voting system meant it still passed. Russia is also considering a complete ban on GMO products.
>
> Syngenta maintains demand for its new Agrisure Duracade seed is strong, particularly in North America, but it's clear resistance is building… several seed companies have declined to license the trait from the biotech because of export concerns and scientists see the likelihood of superbugs developing from their proliferation just as they've witnessed the development of superweeds due to the over application of Monsanto's Roundup herbicide.

The problem for Syngenta is one for the industry as a whole, and though they've got their finger in the dike at the moment, leaks are springing up around them everywhere and the whole structure may soon collapse.

50. Syngenta's acute awareness of consumer and government resistance to genetically modified organisms was confirmed by its own Annual Report on Form 20-F filed on February 13, 2014, with the United States Securities and Exchange Commission on behalf of Syngenta AG, wherein it stated the following:

Syngenta is active in the field of genetically modified organisms in the seeds area and in biotechnology research and development in seeds and crop protection. However, the high public profile of biotechnology and lack of consumer acceptance of products to which Syngenta has devoted substantial resources could negatively affect its public image and results. The current resistance from consumer groups, particularly in Europe, to products based on genetically modified organisms, because of concerns over their effects on food safety and the environment, may spread to and influence the acceptance of products developed through biotechnology in other regions of the world, which could limit the commercial opportunities to exploit biotechnology. Actions by these groups may also disrupt research and development or production of genetically modified seeds. In addition, some government authorities have enacted, and others in the future might enact, regulations regarding genetically modified organisms which may delay and limit or even prohibit the development and sale of such products.

51. With regard to its "corn seeds" business, Syngenta states the following in Annual Report on Form 20-F:

Corn (AGRISURE®, GOLDEN HARVEST®, NK®, INNOTECHTM) hybrids are sold by Syngenta via established distribution channels covering a full range of countries and maturities. In addition, hybrids and inbred lines are licensed to other seed companies in the U.S. via Greenleaf Genetics LLC. Syngenta hybrids are characterized by their high yield potential, stability of performance, uniformity and vigor. Many of Syngenta's elite hybrids are offered as AGRISURE® 3000GT and AGRISURE® VIPTERA® 3111 products which provide built-in insect protection against corn borers, corn rootworms and tolerance to glyphosate herbicide. Competitive hybrids in early maturities, some of them developed through marker assisted breeding, are sold for silage and grain markets. Different varieties of corn seeds are marketed in all regions.

52.  Syngenta's Annual Report on Form 20-F stated with respect to "seeds":

**Seeds**

Field crops

• Through Syngenta's enhanced corn breeding and trait conversion capabilities, twenty new genetic chassis and fifty new corn hybrids were brought into North America production in 2013 for customer use in the 2014 crop year. Ten of these products contain genetics that are new to the market.

\*      \*      \*

o Also introduced are hybrids containing the AGRISURE VIPTERA® 3220 E-Z REFUGE™ trait stack, which offers dual modes of action to control corn borer and above-ground lepidopteran pests, and the AGRISURE® 3122 E-Z REFUGE™ trait stack intended for use in areas where both corn rootworm and lepidopteran pest management are primary concerns. Both products received U.S. Environmental Protection Agency ("EPA") registration in 2012.

o AGRISURE® DURACADE™ was launched in two new products AGRISURE® DURACADE™ 5122 and AGRISURE® DURACADE™ 5222. U.S.D.A. cultivation approval was received in February 2013.

## Syngenta's Genetically Modified Corn — Agrisure VIPTERA™

53.  Syngenta develops and sells, globally and throughout the United States, corn seed with genetically modified traits.  After development, Syngenta then licenses corn seed with multiple genetically enhanced features, called "trait stacks" to seed manufacturers, including Syngenta subsidiaries.

54.  VIPTERA corn containing MIR-162 genetic trait stack was developed by Syngenta by using modern biotechnology techniques. Syngenta modified the corn by inserting genetic material from a bacterium, *Bacillus thuringiensis ("Bt")*. Within the corn-biotechnology industry, corn manipulated in this fashion is commonly referred to as *"Bt* corn."  The specific genetic material inserted into the genome of VIPTERA corn allows the genetically altered corn to produce certain proteins including CrylAb, mCry3A, and Vip3A.  These proteins have insecticidal properties which, according to Syngenta, "controls more insects than any other trait stack on the

market" including Black Cut Worm, Corn Earworm, European Corn Borer, Fall Armyworm, Western Bean Cutworm, and Stalk Borer.

55.     VIPTERA'S insecticidal protection comes from the Vip3A protein, a "vegetative insecticidal protein," which binds to the insect's midgut epithelium and forms pores, killing the insect before further crop damage may be done.

56.     Syngenta invested approximately $200 million and five to seven years developing VIPTERA. Notably, VIPTERA is protected by Syngenta patent(s) giving Syngenta the right to exclude others from selling products with the VIPTERA corn traits. Part of any motivation in pushing this product prior to approval from China and other export customers is Syngenta's desire to maximize its period of exclusivity when no others can sell VIPTERA corn.

57.     As a bio-engineered product, VIPTERA corn was subject to U.S. and foreign regulatory approval prior to cultivation or import.  Syngenta had registered VIPTERA as a pesticide with the Environmental Protection Agency.  VIPTERA was deregulated by the U.S. Department of Agriculture in April 2010.

**Syngenta Seeks Regulatory Approval for MIR-162 "Trait Stock" from China**

58.     Many of the United States export partners take varying periods of time to review and approve or disapprove of new genetically modified grains before they can be imported into that country.  China's regulatory process begins *after* regulatory approval of the seed in the exporting country, and typically takes at least two years for a regulatory decision to be made.  In 2010, Syngenta had only begun the long and necessary process necessary to secure regulatory approval of VIPTERA containing MIR-162 "trait stack" from China — a major U.S. expert market that was projected to proliferate substantially going forward.

59.    Syngenta submitted its initial application to China for seed import permits in March 2010. According to Syngenta it submitted a further application with a local study report in November 2011. All the while, China's Ministry of Agriculture pursued a "zero tolerance" policy toward genetically modified corn using MIR-162. In June 2012, China's Ministry of Agriculture issued official feedback peppering Syngenta with questions and without giving any indication that it was intending to approve MIR-162's import. Syngenta responded to the Ministry of Agriculture's questioning in July 2012. Approximately one year later, in June 2013, the Ministry of Agriculture once again issued official feedback to Syngenta with questions and, once again, without giving any indication that it was intending to approve MIR-162's import. Syngenta submitted its response in July 2013.

60.    In November 2013, the Ministry of Agriculture again issued official feedback demonstrating its ongoing concerns and reservations via questions to which Syngenta responded in November 2013. Bi Meijia, a spokesman for China's Ministry of Agriculture confirmed in a news conference on December 6, 2013, that Syngenta's requests for certification of its MIR-162 corn since March 2010 were found to lack complete experimental data and other required materials — adverse information and events that Defendants knew at all times material, but did not disclose in Syngenta's marketing and sales campaigns inducing U.S. farmers to purchase, plant and grow VIPTERA corn seed.

61.    Recognizing that obtaining MIR-162 import approval in China was **not** imminent, if it would ever be granted, Syngenta held a technical workshop with Ministry of Agriculture officials in February 2014 and submitted yet a further response to the Ministry of Agriculture in March 2014.

**Defendants' Scheme Directly Harming U.S. Corn Growers: Premature Market Release of MIR-162 Seed**

### Defendants' Scheme

62.     Commencing no later than April 2011 and continuing through the present, the Defendants engaged in a scheme that was designed to effectively taint and contaminate the U.S. Corn supply with Syngenta's MIR-162 genetic trait stacks knowing full well that it would not be possible for U.S. farmers to avoid MIR-162 contamination of the U.S. Corn supply and market by virtue of the fact that corn – a commodity – pollinates.  Pursuant to their scheme, Defendants engaged in aggressive marketing and sales tactics utilizing deceptive practices, including false and deceptive public statements and sales materials, to induce unwitting farmers to purchase VIPTERA, and thereafter DURACADE, and grow MIR-162 trait corn that would ultimately either pollinate non-MIR-162 fields, (including non-GMO fields), or ultimately become comingled with non-MIR-162 and non-GMO corn in the handling and commoditization process prior to sale.

63.     Defendants' engaged in their scheme to so taint and contaminate the U.S. Corn supply knowing that it would prejudice the acceptance of delivery of U.S. Corn exported to countries that had a zero tolerance policy regarding GMO corn, or that did not accept and approve or were otherwise reticent to accept or approve corn containing MIR-162 genetic trait stacks – especially China – and they would thereby harm, damage and directly disrupt the U.S. Corn commodities market.  Defendants scheme was relentless and continued to market and sell Syngenta's DURACADE containing MIR-162 genetic trait stacks and other genetic modifications in 2014 and thereafter, even in the face of significant protest from well recognized groups and industry entities chastising Syngenta for the premature sale and growing of VIPTERA MIR-162 trait stack seed since 2010, prior to import approval from foreign export nations and even after

China's rejection of delivery U.S. Corn found to be tainted with MIR-162. Defendants' bold scheme to aggressively market and sell MIR-162 trait corn seed that was not approved in U.S. major export markets flagrantly disregarded the rights of non-GMO and non-MIR-162 farmers and was designed to harm them economically in pursuit of Defendants' economic self-interests.

### Premature Release of VIPTERA Pursuant to Defendant Scheme

64.     In the spring of 2010, Syngenta made the decision to release VIPTERA corn commercially for the *2010/11* growing season. This release came at a time when VIPTERA lacked approval by import markets such as China, Japan, and the European Union. China, having not approved the importation of VIPTERA corn, had maintained a zero tolerance policy regarding contamination of corn imports containing MIR-l62. This means that *any* detection of MIR-162 in a shipment to China could result in rejection of that shipment. Syngenta had knowledge of China's zero-tolerance policy prior to the commercialization of VIPTERA corn.

65.     Further, Syngenta had knowledge that there was no means of detecting a "zero" level of MIR-162 in a given sample. Charles Lee - Syngenta's North American Head of Corn - stated, when asked about potential detection methods, "Yeah, nothing can detect to zero." *Exhibit L,* Deposition of Charles R. Lee - Sept. 7, 2011, *Syngenta Seeds, Inc.,* v. *Bunge North America, Inc.,* No. 5:11-cv-04074-MWB, (N.D. Iowa Sept. 15,2011) ECF No. 32-6, 92:21. And there is always a risk that if a corn shipment is tested in the U.S. and is negative for MIR-162, a second test at port could result in a positive for MIR-162.

66.     There was no requirement that Syngenta commercialize VIPTERA corn at this time. However, as stated by Mr. Lee, Syngenta was "trying to recoup [its] costs as an organization." Further, Syngenta "[l]ike anybody, [wanted] to derive some income from [its] products." *Id.* at 70:22 -71:13. Syngenta also commercialized VIPTERA corn before major

market approval as "[y]ou have to operate in the nongeneric period [of Syngenta's patent covering

VIPTERA corn]. You like to optimize that period." *Id.* at 72:3-6.

67. Defendants aggressive release and marketing of unapproved VIPTERA and later

DURACADE containing MIR-162 genetic trait constituted an intentional and flagrant failure to

exercise corporate responsibility and they knew it. A Joint Statement on Media Reports of

Lawsuit Involving Syngenta's Agrisure Viptera™ Corn (MIRI62), issued by the NGFA and the

NAEGA confirmed:

> U.S. farmers, as well as the commercial grain handling and export industry,
> depend heavily upon biotechnology providers voluntarily exercising corporate
> responsibility in the timing of product launch as part of their product
> stewardship obligation. Technology providers must provide for two critical
> elements: First maintaining access to key export markets like China, or for that
> matter any market like China that has a functional, predictable biotech-approval
> process in place; for restricted marketability of their products based upon
> approval status in major markets. The negative consequences of overly
> aggressive commercialization of biotech-enhanced events by technology
> providers are numerous, and include exposing exporting companies to financial
> losses because of cargo rejection, reducing access to some export markets, and
> diminishing the United States' reputation as a reliable, often-preferred supplier
> of grains, oilseeds and grain products. Premature commercialization can reduce
> significantly U.S. agriculture's contribution to global food security and
> economic growth.
>
> Putting the Chinese and other markets at risk with such aggressive
> commercialization of biotech-enhanced events is not in the best interest of U.S.
> agriculture or the U.S. economy.

### Defendants Knew the Danger and Risk of MIR-162 Contamination

68. Defendants knew the potential for catastrophic damage when unapproved traits are

released prematurely, given the biological dynamics of corn replication by cross-pollination from

one plant to another. Pollen from corn stalks "drift" over considerable distances and consequently

cross-breeds with other corn plants. The U.S. corn marketing system is commodity-based and

gathers, commingles, and ships corn from hundreds and thousands of farms through local,

regional, and terminal grain elevators, with few expectations. Defendants knew that corn can be a cross-pollinating plant. They also knew that MIR-162 genetic trait corn seed grown in corn fields was likely to cross-pollinate and/or contaminate by other means non-genetically modified and non-MIR-162 genetic trait corn varieties and land, thereby reducing their value by rendering these crops unmarketable or less marketable. Further, Defendants knew that scientists since the early 1970s had warned of the danger of contamination of genetically modified organisms in the biotechnology field and that specific precautions had to be taken to prevent the release of genetically modified organisms into the environment. Defendants intentionally ignored these concerns.

69.     At that time and through the present-day, Defendants also knew that non-GMO corn and non-MIR-162 genetic trait corn can become contaminated with MIR-162 genetic trait GMO corn through a wide variety of means beyond cross-pollination, which additional means include, but are not limited to, natural events/creatures transporting the contaminated MIR-162 genetic trait seed genetically modified corn from field to field, farm equipment used on a field unknowingly contaminated with MIR-162 genetic trait genetically modified corn and then used on a field with non- genetically modified non- MIR-162 genetic trait corn thereby transporting the MIR-162 genetic trait genetically modified corn and contaminating the non- MIR-162 genetic trait genetically modified field, and by commingling during harvest, transport, storage and/or processing, and voluntary contamination.

70.     Defendants also knew that due in part to added costs relating to the segregation of corn, to insufficient storage capacity, and to the fact that many U.S. grain elevators, storage, and transportation facilities are simply not set up to test and segregate corn, it could not reasonably expect that those facilities would or could segregate corn and keep MIR-162 genetic trait

genetically modified corn out of the general corn supply. Defendants also knew that once MIR-162 genetic trait genetically modified corn contaminated the general corn supply in the U.S., such contamination would significantly disrupt the storage, transportation, distribution and marketing of corn, cause significant added costs to corn farmers, and detrimentally impact the market price for U.S. corn.

71.    In marketing and selling VIPTERA (and thereafter DURACADE) in the U.S., Defendants knew that it was impossible to completely isolate VIPTERA (or DURACADE) corn from other varieties of corn and that VIPTERA corn (and DURACADE) corn would inevitably cross-pollinate with other corn plants. Syngenta therefore knew, or should have known, that even if strict precautionary measures could be implemented at all levels — from the farm level from planting through the marketing chain — given the nature of the U.S. grain handling system, VIPTERA (and DURACADE) would contaminate other U.S. corn crops, infiltrate the general U.S. corn supply, and therefore cause problems in foreign markets that imported U.S. corn but had not approved VIPTERA corn (or DURACADE corn).

72.    Despite this knowledge, Defendants managed and controlled events to allow and continue to release, market and sell VIPTERA (and DURACADE) prior to securing necessary foreign nation approvals — and particularly China — and consciously and purposely failed to take or implement all adequate, reasonable and necessary precautions to prevent or diminish the contamination of the corn supply. Defendant's acts and omissions caused significant harm to U.S. Corn growers resulting from the MIR-162 genetic trait contamination.

**Bunge's Refusal to Accept VIPTERA Corn in its Grain Elevators**

73.    Defendants cannot genuinely deny that they were unaware of the potential harm caued by the premature release of unapproved genetic traits.    After Syngenta introduced *VIPTERA*, a major grain elevator, Bunge North America, Inc., ("Bunge") posted a policy stating it would not accept *VIPTERA* during the 2011-2012 growing season:

> Please note that Bunge currently **is unable to accept** delivery of corn/soybeans produced from the following seed products for the 2011/12 growing season:
>
> ### Agrisure® Viptera™ – MIR162 (Syngenta) Plenish™ soybeans (DuPont/Pioneer)
>
> These seed products have not received necessary international approval from major export destinations for the U.S.
>
> Bunge facilities are integrated into the export market, which is why the terms of Bunge's purchase contract states that Bunge will not accept grains and oilseeds containing transgenic events not approved for U.S. export markets.
>
> Bunge will accept a listed product once the seeds receive approval from major export markets
>
> ## Please contact the facility manager or your grain marketing specialist if you have any questions.



Receive July 5  2011

Case 5 11-cv-04074-MWB   Document 5-1   Filed 08/26/11   Page 27 of 31

74.     Bunge cited the lack of Chinese import approval as its reason for not accepting *VIPTERA* corn.     Bunge's efforts were designed to protect the U.S. Corn supply from contamination.  This did not sit well with Defendants and posed an obstacle to the successful achievement of their plan and scheme.

75.     Consistent with and in order to further Defendants' plan and scheme, attorneys appearing for Syngenta sued Bunge in federal court, *Syngenta Seeds, Inc. v. Bunge North America, Inc.*, No. C  11-4074-MWB (N.D. Iowa) (Bennett, J), seeking preliminary and permanent injunctions requiring Bunge to stop posting materials regarding its refusal to accept *VIPTERA* corn. The lawsuit also sought an injunction that would have required Bunge to accept *VIPTERA* corn at its facilities.  Defendants' attorneys appearing on Syngenta's behalf boldly and falsely represented in court filings that China was expected to approve VIPTERA containing MIR-162 genetic trait by March 2012.

76.     Bunge replied to the lawsuit by stating that its decision not to accept *VIPTERA* followed the North American Export Grain Association's policy to advocate that agritechnology providers receive all major international approvals for a trait prior to seed sales. Bunge stated that Syngenta had undertaken an action that could put at risk a major export market for United States corn (China).  Syngenta's request for a preliminary injunction was denied and, several of Syngenta's claims were dismissed on the pleadings, while others were voluntarily dismissed. Defendants remained relentless and Syngenta appealed.

### Defendants Utilize a Significant Marketing and Distribution Machine to Carry out Their Scheme

77.     Meanwhile and pursuant to their scheme, Defendants deployed a significant marketing and distribution machine to sell Synenta's genetically modified corn seeds containing MIR-162 trait.  Defendants maintained marketing organizations in all of Syngenta's major

markets with dedicated sales forces that provide customer and technical service, and promotion and marketing support.  Syngenta's VIPTERA and DURACADE seed products are sold to the end user through independent distributors and dealers and in accordance with either a two-step or a three-step distribution chain.  In the two step chain, Syngenta sells its products to cooperatives or independent distributors, which then sell to the growers as the end user.  In the three-step system, Syngenta sells to distributors or cooperative unions which act as wholesalers and sell the product to independent dealers or primary cooperatives before on-selling to growers.  Syngenta also sells directly to large growers in some countries.

78.     Defendants' range of deceptive advertising and promotional tools deployed as part of their scheme to market and sell VIPTERA and DURACADE, incorporated meeting with growers and distributors, field demonstrations, advertisements in specialized publications, direct market activities and the dissemination of information via the internet.  In pursuit of the scheme, Defendants disseminated false and deceptive statements, marketing materials and communications through the means of interstate commerce, including the mail and electronic wires, among them the internet and quarterly conference calls.

79.     The Defendants relied heavily on a so-called "Syngenta Seed Advisors Network." As more fully alleged below, Syngenta Seed Advisors provided support to growers, including providing them with advice and counsel, and were a major component in spreading the gospel of Syngenta's VIPTERA and DURACADE seed products containing MIR-162 in furtherance of the scheme.  This aggressive marketing system was very effective.  Commencing with the growing season in 2012 and continuing thereafter, Syngenta's VIPTERA contaminated the U.S.'s corn supply with genetic trait MIR-162.  Contamination of the U.S. Corn supply with MIR-162 genetic trait stacks is continuing.

**Defendants' Scheme Uses Deceptive Means to Market and Sell VIPTERA**

80.     Defendants deceived U.S. Corn growers and the U.S. Corn market as part of their plan and scheme. Syngenta repeatedly downplayed and misrepresented the significance of the export market for corn on U.S. corn prices, China's key role in the U.S. export market, and the timing of Chinese approval of M1R162.  Defendants caused Syngenta to do this with the intention of encouraging farmers to continue to buy and plant its MIR-162 corn.

81.     For example, Syngenta published a "fact sheet" on its website about VIPTERA called "Plant with Confidence," which is directed at farmers. Syngenta's fact sheet engaged in direct misrepresentations about U.S. corn exports. In order to convince farmers that the loss of key export markets was unimportant, Syngenta's "Plant With Confidence" marketing materials deceptively stated that "in the last five years, on average, only about 13 percent of U.S. corn has been exported." Additionally, Syngenta claims that "the vast majority of corn produced in the U.S. is used domestically."[1]  The U.S.D.A. Economic Research Service, however, has reported that approximately 20 percent of U.S. corn is exported to other countries and touts the U. S. as "a major player in the world corn trade market.[2]

82.     Syngenta's "Plant With Confidence" fact sheet deceptively downplayed the importance of China as an export market for U.S. Corn. The fact sheet stated that China imported, on average, a little more than half of one percent *(0.5%)* of all U.S. corn produced in the past five years. Syngenta's fact sheet also stated that "traditional major markets are legally able to accept

---

[1]     *See* Agrisure Viptera "Plant With Confidence" Fact Sheet,http://www.syngentaus.com/viptera exports/images/Agrisure-Viptera-Fact-Sheet.pdf.

[2]     *See* U.S.D.A. Economic Research Service (Figures Updated May 2014), at http://www.Ers.usda.gov/topics/crops/corn/background.aspx#.VCGNPfldU2s.

Agrisure VIPTERA grain," which implies that China is not a traditional major market. However, Defendants knew that by 2010, China was projected to be a top-five importer of U.S. Corn and had become a major market for U.S. Corn.

83.     As the 2012-2013 growing cycle approached and unfolded, and despite their internal knowledge that Syngenta's application for approval of MIR-162 was not faring favorably at that time with China's Ministry of Agriculture, Defendants nevertheless misinformed farmers, grain elevators, grain exporters, landowners, Syngenta's own investors, the farming community and the general public, leading them to believe that approval from China was imminent. For example, during Syngenta's first quarter 2012 earnings conference call, on April 18, 2012, which was disseminated to the general public and market via telephone and wire communications, and on the internet, Syngenta CEO Mack falsely stated in a company conference call "[t]here isn't outstanding approval for China, which we expect to have quite frankly within the matter of a couple days ... we know of no issue with that whatsoever.... "

84.     CEO Mack's statement was made as an advertisement for VIPTERA corn and specifically referred to VIPTERA Mack's 2012 statement was false, deceptive and misleading and disseminated sufficiently to constitute promotion within the grain industry. This statement, and others like this, dangerously impacted the corn market by, for example, encouraging 1) farmers to plant MIR-I62, 2) grain elevators to accept and comingle MIR-162 with other grains, and 3) exporters to purchase and ship products containing MIR-162.

85.     Contrary to Syngenta's affirmative misstatements, VIPTERA containing MIR-162 genetic trait was never approved by China anytime in 2012 and certainly was never approved in a matter of days.  China had serious concerns about VIPTERA containing MIR-162 and Defendants knew of the existence of those concerns at all times material, including when CEO

Mack spoke. China continuously expressed those concerns, peppering Syngenta with questions in 2013 and through 2014.

86.     Syngenta also misled exporters into believing products containing MIR-162 would be accepted in China. On its website, Syngenta offered a form entitled "Request Form For Biosafety Certificate(s) Issued by the Chinese Ministry of Agriculture." See, e.g., http://www.syngenta.com/country/us/enlagriculture/Stewardship/Documents/ChinaSafetyCertifi cateApplication.pdf (last visited Sept. 9, 2014). This form states, "Biosafety Certificates for the following transgenic event(s) were issued to Syngenta Seeds AG... by the Ministry of Agriculture (MOA) of the People's Republic of China (PRC)." Syngenta's request form includes MIR-162 among approved genetically modified traits even though 162 was not approved. One of the "transgenic event(s)" listed on this Syngenta form is MIR-162. The Syngenta form continues "The requested Biosafety Certificates will be provided to Recipient to assist Recipient in obtaining required authorization for shipments containing the above marked Corn Product(s) into China," and additionally states, "The Biosafety Certificate(s) provided allows importation of the above marked Corn Product(s) as raw materials for processing for food and feed use only, not for any research purpose or cultivation purpose." The implication of this form is clear. The form and corresponding language appear to emphasize that if an exporter completes the form, Syngenta will then issue a Biosafety Certificate, which will allow the cargo to enter China. The form contains misleading implications because it does not state that any products with MIR-162 would be rejected.

87.     Syngenta's request form was released as an advertisement for *VIPTERA* corn, as it indicates that products containing MIR-162 may be imported into China if the form is correctly filled out. Defendants knew that MIR-162 was not approved for import into China, but included

MIR-162 on the Syngenta request form based on economic motivations, including the continued sales of *VIPTERA* corn. Syngenta's request form was disseminated via instumentalitites of mail and wire, including the internet, and was widely promoted within the seed sales industry.

88.    Defendants continued to deceive U.S. Corn farmers and related businesses even after China's rejection of the delivery of U.S. Corn commencing November 2013, as more fully discussed below. As part of their scheme to contaminate the U.S. Corn supply with Syngenta's MIR-162 genetic trait stacks by continued sales of VIPTERA and, commencing in 2014, DURACADE, a document was published on Syngenta's website dated January 2014 entitled, "Agrisure VIPTERA & China Import Approval FAQs" that misrepresented the truth about China's lack of approval of VIPTERA. The article suggested that China was avoiding approval of VIPTERA as a pretext to encourage consumption of domestic Chinese corn.[3] The publication on Syngenta's website concealed and failed to disclose the fact that China had repeatedly requested more information from Syngenta and asked numerous questions regarding its submission for approval of VIPTERA and that Syngenta's submissions were incomplete and raised concerns.

**Premature Release of DURACADE Pursuant to Defendants Scheme.**

89.    In 2014, in furtherance of the Defendants' scheme, and while Syngenta continued to market VIPTERA containing MIR-162 trait, even in the face of rejection by China and protests or disapproval from other relevant entities, the Defendants commenced marketing a new wave of genetically modified corn seed named AGRISURE® DURACADE™ ("DURACADE"). There were two varieties of DURACADE, both of which were a hybrid combination of various genetically modified traits, one of which contained MIR-162. DURACADE continued to be

---

[3]    See http://www.syngenta-us.com/Viptera_Exports/images/Viptera-QA.pdf

40 – Plaintiffs' Class Action Complaint

marketed, distributed and sold to U.S. Corn growers as part of the scheme in the face of

Defendants knowing that every one of the twenty-eight states of the European Union, Brazil,

Switzerland, Columbia, Egypt, India, Philippines, The Russian Federation, Indonesia, Thailand,

Singapore, Belarus, Turkey and, significantly, China, refused to approve DURACADE for animal

or human consumption.

90.     In 2014, also in furthermore of the scheme, Defendants enlisted Gavilon Grain,

LLC as a participant in what Syngenta called the "Right to Grow Program," designed to further

induce growers to purchase Syngenta's DURACADE corn seed containing MIR-162 genetic trait

technology.  Under the Right To Grow Program, U.S. Corn growers were assured by Syngenta

marketing materials, including its program brochure advertised on its website, that they would

have "marketing options" at harvest, "even though some import markets are still in the approval

process."  To that end, the Right To Grow Program envisioned grain containing DURACADE to

be fed on farms or transported to approved destinations, including feed mills, feed lots and

accepting elevators, or ethanol plants.  Growers remained responsible for planting, harvesting and

stewardship of DURACADE under a "Syngenta Stewardship Agreement."  However, Syngenta's

marketing material and internet site stated "if grain marketing assistance is needed, Gavilon

Grain, LLC, a leading commodity management firm, will accept grain containing Agrisure

DURACADE at market price, while providing stewardship and distribution services."

91.     The Right to Grow Program was intended to be yet another vehicle by which

Defendants' scheme would be able to continue by selling Syngenta corn seed product that was not

approved by China, the European Union or other import markets and thus, continue Defendants'

ongoing plan to colonize and taint non-GMO U.S. Corn and disrupt the U.S. Corn market.  The

Right to Grow Program was designed to induce growers to use Syngenta genetically modified

corn seed DURACADE product by making them feel confident in the ability to do so and still sell their corn, because Gavilon, a commodity management firm, would thereby find outlets for sale to those nations or entities that were willing to accept such traits, further enhancing Syngenta's ability to control the flow of corn in the commodities market and unfairly compete against non-GMO and non-MIR-162 U.S. growers who were being harmed by Defendants' plan and scheme.

92.     Defendants knew full well that the Right to Grow Program's Stewardship Agreement ostensibly offered to growers of DURACADE, to prevent or minimize comingling with non-GMO corn, was purely cosmetic given the nature of how corn pollinates and the inability to ever achieve a zero tolerance requirement as demanded by China.  Demonstrating Defendants' full knowledge of the danger of GMO and MIR-162 contamination at all times material, the so-called "Syngenta Stewardship Agreement" outlined responsibilities of growers with regard to their stewardship of trait technologies, including directing grain produced from seed products to appropriate markets, as necessary, to prevent movement to markets where the grain had not yet received regulatory approval for import.  However, this cosmetic precaution, in the guise of the "Syngenta Stewardship Agreement" within the "Right To Grow Program" relating to DURACADE, placed the burden not on Syngenta but on its customer growers and did not eliminate the risk of contamination of the U.S. Corn supply.  The stewardship proposed by Syngenta was concerned not with protecting non-GMO and non-MIR-162 genetic trait growers who had been directly harmed by Defendants conduct and the actions of the RICO scheme but, instead, merely served as yet another inducement for growers designed to induce their continued purchase of MIR-162 genetic trait corn seed even though it had not been approved by major export

markets – especially China – and thus enabling the furtherance of Defendants' scheme and enterprise.

**China's Rejection of U.S. Corn and Protests by Other Relevant Entities**

93.     In November 2013, Chinese regulatory officials rejected cargo shipments of U.S. corn after the shipments tested positive for the trace presence of VIPTERA containing MIR-162 trait. On December 24, 2013, the General Administration of Quality Supervision, Inspection and Quarantine of China issued a warning notification strengthening the inspection and supervision for the import of GMO feed materials. This notification stated the impetus was that Shanghai Chinese Inspection and Quarantine Service ("CIQ") had detected MIR-162. The December 24, 2013 notification indicated that all batches of corn would now be tested at the Chinese ports for MIR-162, and that any cargo which tested positive for MIR-162 would be returned or destroyed. After this notification, all U.S. Corn export transactions were at increased risk.

94.     Also, since China initially only required certification from the seller/exporter that the shipped corn did not contain MIR-162, a negative test result from the seller/exporter was sufficient. This allowed predictability in that customers in China would know from the beginning of a contract that the corn products would clear Chinese customs.

95.     But once testing occurred at Chinese ports, an increased risk was placed on export contracts because there was no way to detect a "zero" level of MIR-162 (i.e., a negative test of a container in the U.S. could still result in a positive test in China). This caused an initial amount of Chinese customers to walk away from their contracts, placed great deal of uncertainty on the market, and dramatically hurt corn prices.

96.     Once the public became aware of the contamination related to MIR-162 trait, the response in the U.S. Corn market was swift and negative, thereby demeaning the value of U.S.

growers' non-GMO corn crops and pricing, and even the value of their land. Since November 2013, Chinese imports for U.S. corn have decreased by about 85 percent. Syngenta's contamination of the U.S. Corn crop and non-GMO corn growers resulting damages are ongoing. MIR-162 corn seeds are very difficult to completely remove from farming equipment, buildings, drying/milling/processing facilities and storage facilities, many of which non-GMO corn growers utilize year after year.

97. According to Bi Meijia, spokesman for China's Ministry of Agriculture ("MOA"), the ministry received requests for certification of the MIR-162 corn from Syngenta on several occasions since March 2010, but found the experimental data and other materials incomplete. "The ministry asked the Company to supply missing materials on the principle of caution."

98. Concerned about yet another premature release of an unapproved GMO seed product, and given the damage Syngenta singlehandedly caused to the corn export market with its premature release of VIPTERA corn, the National Grain and Feed Association ("NGFA") and North American Export Grain Association ("NAEGA") released a joint statement to Syngenta as of January 22, 2014, requesting that Syngenta stop the release of DURACADE corn, so that it would stop the cycle of rejection and damage. In that statement entitled *Joint Statement Issued by NGFA and NAEGA Regarding Letter to Syngenta Requesting Suspension of Commercialization Activities of Syngenta's Agrisure Viptera® and Duracade® Corn*, the organizations jointly stated:

> NAEGA and NGFA are gravely concerned about the serious economic harm to exporters, grain handlers and, ultimately, agricultural producers - as well as the United States' reputation to meet its customers' needs - that has resulted from Syngenta's current approach to stewardship of Viptera. Further, the same concerns now transcend to Syngenta's intended product launch plans for Duracade, which risk repeating and extending the damage. Immediate action is

required by Syngenta to halt such damage. (Joint Statement Issued by NGFA and NAEGA Regarding Letter to Syngenta Requesting Suspension of Commercialization Activities of Syngenta's Agrisure Viptera® and Duracade® Corn).

99.    Yet, despite the joint petitions and pleas from the NGFA and NAEGA, Syngenta released DURACADE. This second premature release further jeopardized the Chinese import market, as DURACADE contains not only unapproved MIR-162, but also other unapproved traits.

100.    On February 13, 2014, Bungy decided to reject all shipments of corn containing DURACADE variety unless and until Duracade was approved by China. On February 14, 2014, Cargill filed suit. On February 27, 2014, Archer Daniels Midland ("ADM") grain elevators also refused to accept Syngenta's DURACADE seed product. ADM and most of the major United States grain exporters believed that seed company's like Syngenta should market their products responsibly. Commingling seed products that are not approved by China and many of the major export markets is completely irresponsible.

101.    Nonetheless, Syngenta repeatedly rejected pleas to stop selling VIPTERA. Syngenta also refused to delay its commercialization of DURACADE, despite knowing that the premature unleashing of DURACADE upon the U.S. Corn growers could cause similar damage to U.S. Corn markets as was inflicted by VIPTERA.

102.    On March 25, 2014, *Reuters* reported that defendant Morgan, Syngenta's Regional Director – North America, blamed China's rejection since November 2013 of over 900,000 tonnes of U.S. Corn containing Syngenta's Agrisure VIPTERA MIR-162 trait on "a global issue at play here relating to contracts and prices." Morgan also cited as an additional reason for China's rejection that there was pressure from individuals in China who believe the country should be

more self-sufficient in food production, adding that there is no one reason behind the rejections. Morgan further noted that after years of waiting for approval, he had become "sober" with respect to his expectations of what would come out of China. "I'm hopeful that they will proceed in the next discussion, but until we hear from them I'm not going to count any chickens, as they say," Morgan was quoted as saying as reported on March 25, 2014 by *Reuters*.

103. Defendant Morgan's explanations for China's refusal and lack of approval intentionally concealed and failed to disclose one very important fact: Syngenta's long-standing submissions of data to China's MOA was incomplete, continuously forcing China to ask for additional data from the Company respecting MIR-162 genetic trait corn seed, failing which the MOA would not grant its approval. Morgan's comments were disseminated by him over electronic wires and phone lines and reported by Reuters over the electronic news wires and the internet. Intent on aggressively marketing VIPTERA and yet another unapproved product — DURACADE — to U.S. farmers, the Defendants did not want to reveal that there were longstanding safety and health issues respecting MIR-162 that were being addressed by China's MOA over several years, and that Syngenta's data submissions were incomplete, fearing that disclosure of such adverse events and information might inhibit sales of such products and thus become an obstacle in their goal of contaminating the U.S. Corn supply.

104. China strengthened its policy regarding MIR-162 again in July 2014, after an increasing number of U.S. corn shipments tested positive. This market shift came as China was projected to import a record high seven million tons of U.S. corn, according to the U.S. Department of Agriculture. Since November 213, China's import for U.S. Corn decreased by 85%.

105.   Defendants knew that disruption of the Chinese import market would influence the global corn market, that contracts between grain exporters and Chinese corn buyers would be negatively affected if MIR-162 was found in grain exports to China, and that U.S. farmers would suffer damages if these contracts were placed at risk, in a declining market and a lower sale price per bushel of corn.

106.   Since November 2013, Beijing had rejected a total of nine hundred thousand tons of corn from the United States after detecting Syngenta corn strain MIR-162, reported as of March 21, 2014.  However, China's imports of non-GMO corn from Ukraine surged to 192,374 tonnes in February 2014, bringing the country's total imports in the month of February to 479,758 tonnes, up 21.7% on the year.  China started importing corn from Ukraine late in 2013 and its feed mills continued to book cargos under a loan-for-grains deal signed in 2012.  In January 2014, China signed a strategic deal with the Ukraine to establish Crimea's port facilities to export grain from the region as part of Beijing's global push to secure agricultural and food assets.

107.   Russian's invasion of Crimea in and about February 28, 2014 threatened China's reliance on Ukraine's corn supply.  The Russian invasion of the Crimean Peninsula and subsequent strife and disruptions made securing corn from the Ukraine unreliable and highly problematic.

108.   The *NASDAQ* newsletter published in March 2014, predicted that a disruption in supplies from the Ukraine would trigger an increase in demand for U.S. corn.  Before tensions escalated in Crimea, Ukraine was set to be the third-largest shipper of corn in the world in 2014. It was the fourth largest exporter in 2012-2013, behind the U.S., Brazil, and Argentina.  On March 3, 2014, *Bloomberg* reported that Ukraine was poised to ship 10.3 million tons through June 2014 versus 13.6 million tons a year earlier compared to 35.5 million tons from the U.S. and 24 million

tons from Brazil. The escalation of tensions following Russia's invasion of Crimea raised notable questions for grains-flow potential out of the Black Sea. And according to a U.S. Grains Council statement at the end of February 2014, farmers in Ukraine were slowing sales of corn, holding it as a hedge against the nation's depreciating currency. As of March 3, 2014, Ukraine sill had about 4 million tons of corn to ship as part of its 2013-2014 export campaign according to Olivier Bouillet, manager of the Kiev office of Paris based farm advisor Agritel S.A.

109.    According to Dianne Klemme, vice president of Grain Services Corp., an advisor and cash grain broker in Atlanta, "if shipping problems develop it will boost demand for U.S. corn." According to *Bloomberg*, (March 5, 2014), Cary Sifferath, a regional director for the U.S. Grains Council stated: "Ports are open and vessels are loading, but shipments are becoming increasingly difficult... we hope for a peaceful and speedy resolution of Ukraine's crisis, but the instability is creating opportunities for additional U.S. exports to.... China." According to Shawn McCambridge, a senior grain analyst at Jeffries Bache, LLC, "the events are evolving very quickly and Asian grain buyers are going to shy away from any new purchase from either Russian or Ukraine...buyers will work down any cargoes they have and look to other suppliers for new purchases." (*Bloomberg*, 3/5/14). Grain Council's Siffereth also noted that worsening Ukraine's problems was that the fact that its corn planting, set to start in April 2014, would be restricted by the lack of credit availability due to the Crimean crisis, thus disabling Ukraine's farmers from planting all the acres they had intended. (*Bloomberg* 3/5/14).

110.    As a consequence of Russia's invasion of Crimea and its sponsorship of pro-Russian militia operations in the Ukraine, countries like China became more dependent on imports of corn from the U.S.. The advantageous impact of the turmoil in Ukraine was not lost on the Defendants.

Defendants relentlessly pushed Syngenta's DURACADE containing MIR-162 genetic trait and VIPTERA as China saw its Ukrainian corn option grow more and more unreliable and dangerous.

111.    Syngenta inevitably became one of the major beneficiaries of Russia's invasion of Crimea and resulting tensions worldwide. Faced with a contaminated U.S. Corn supply upon which China had become even more dependent given a host of problems associated with the importation of corn from the Ukraine, China had very little choice but to accept MIR-162 genetic trait corn or American corn imports containing MIR-162 genetic trait stacks on December 15, 2014, in order to feed its vast human population and livestock. However, considerable damage had already been inflicted by Defendants' scheme by that time.

**Massive Damages to the U.S. Corn Market.**

112.    According to the National Grain and Feed Association, the premature release of VIPTERA through 2013 cost the U.S. corn market a minimum of $1 billion - and up to $2.9 billion – due to the rejection and resulting seizures of U.S. containers and cargo ships transporting U.S. corn to China.

113.    Prompted by the harm that Syngenta has caused to the U.S. corn market, the NAEGA, which represents the big grain companies, submitted its position to the U.S. Department of Agriculture calling on all seed makers, including Syngenta, to "commit to fully bear the risks and liabilities associated with any commercialization or launch" of new genetically modified seeds. The NAEGA further noted that its members "object to commercialization prior to major market approvals unless the technology provider assumes appropriate responsibility for economic losses associated with such commercialization." While the NAEGA's statements were intended to apply generally, it specifically noted that "[o]ur recent experiences in significant disruptions in U.S.-China corn trade, exemplifies both how impactful these commercialization decisions can be

on U.S. agriculture and how the financial risks and damage are not broadly shared across the value chain. A unilateral decision to commercialize ahead of major market approvals causes significant damage to U.S. agriculture and short and longer term opportunities to grow and serve our global markets."

114.   Upon information and belief, VIPTERA constitutes approximately 25% of Syngenta's corn portfolio. In 2013, Syngenta's corn sales were over $3.5 billion.  (Syngenta's Annual Report, Form 20-F, Pg. 13, filed with the Securities and Exchange Commission on February 13, 2014).

115.   Defendants knew at all time material, that VIPTERA containing MIR-162 would cripple exports of corn to China. Syngenta likewise knew of the devastating effect of its premature release of MIR-162 because, as Syngenta states in its Bio Product Launch Policy, "We will conduct market and trade assessments to identify key import markets for all of our biotech products prior to product commercialization." See, www.syngentabiotech.coml biopolicy.aspx (as of Sept. 11, 2014).   Nevertheless, in 2011, 2012, 2013, 2014 and thereafter, and with such knowledge, Syngenta prematurely released its GMO corn seed containing MIR-162 in utter disregard of its anticipated consequences and the damage its premature release would inflict upon U.S. Corn growers and the U.S. Corn market.

116.   Despite the above, Defendants continued their predatory conduct by releasing, in 2014, a second version of MIR-162 corn, DURACADE, once again without import approval from China and which, to date, has not been approved.

117.   Syngenta's public statements and marketing and sale documents relating to the approval status of MIR-162 in China were misleading and uniformly failed to disclose material facts that MIR-162 was not approved in China.  Syngenta's widespread contamination of the U.S.

Corn and corn seed supply with MIR-162 resulted in damage to the U.S. Corn export market to China and consequently caused the substantial disruption and devastation of corn and related corn commodity prices for U.S. corn.

118. Defendants scheme was born of their view that it was more profitable to speed VIPTERA to the market, maximize and extract a huge profit, and recoup its research costs, even though they knew that the premature release of VIPTERA corn would prevent U.S. Corn from being sold to markets such as China. By doing this, Defendants crippled the 2013/2014 corn export market to China.

## CLASS ACTION ALLEGATIONS

119. Plaintiffs sue under Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of himself and a class comprising:

**Nationwide Class:**

All persons and entities that grew, harvested, and sold non-MIR-162 corn commercially (or who received revenue from such corn under a crop-share agreement) and were damaged by Defendants premature release of VIPTERA.

Excluded from the Class and Subclasses are the Court and its employees; Syngenta; any parent, subsidiary, or affiliate of the Syngenta; and all employees and directors who are or have been employed by Syngenta or its parents, subsidiaries or affiliates during the relevant time period and any immediate family of defendants Michael Mack or David Morgan and any trust or entity either of them own or control. (the "Class").

120. Plaintiffs reserve the right to amend the Class and Subclass definitions prior to class certification.

121. Plaintiffs seek to represent the Class for any damages and injunctive relief. Plaintiffs assert claims against Syngenta individually and on behalf of all Class members for the violations of law alleged herein.

122.   The requirements of Rule 23(a) are satisfied for the proposed Classes because the members of the proposed Class are so numerous and geographically dispersed that joinder of all its members is impracticable. Although the exact number and identity of each Class member is unknown there are believed to be not less than tens of thousands of Class members nationwide and not less than thousands of Subclass members in the State of Iowa. Therefore, the numerosity requirement of Rule 23(a)(1) is met.

123.   The commonality requirement of Rule 23(a)(2) is satisfied because there are questions of law or fact common to Plaintiffs and the other Class members. Among those common questions of law and fact are:

(a)   Whether Defendants, through their acts or omissions, caused or allowed MIR-162 to contaminate and commingle the U.S. corn and corn seed supplies;

(b)   Whether Plaintiffs and the other Class members have sustained or continue to sustain damages because of Defendants wrongful conduct, and, if so, the proper measure and formula to be applied in determining damages for the injuries sustained;

(c)   Whether Plaintiffs and the other Class members are entitled to compensatory, consequential, and exemplary damages; and

(d)   Whether Plaintiffs and the other Class members are entitled to declaratory, injunctive, or other equitable relief.

124.   Plaintiffs' claims are typical of the other Class members' claims because the claims arise from the same conduct by Defendants and are based on the same legal theories. Further, Plaintiffs seek the same forms of relief for himself as he seeks for the other Class members. Therefore, the "typicality" requirement of Rule 23(a)(3) is satisfied.

125.   Because Plaintiffs' claims are typical of the claims of the other members of the Class and Subclass that Plaintiffs seek to represent, Plaintiffs have every incentive to vigorously pursue those claims. Plaintiffs have no conflicts with, or interests antagonistic to, the other Class

members damaged because of the conduct alleged. Plaintiffs are committed to the vigorous prosecution of the claims, which is reflected in Plaintiffs' retention of competent counsel experienced in complex and challenging litigation.

126.   Plaintiffs' counsel satisfies the requirements of Rule 23(g) to serve as Class counsel. Plaintiffs' counsel have identified and thoroughly investigated the claims set forth, and are highly experienced in the management and litigation of class actions and complex litigation, including claims under federal law, including "RICO". Plaintiffs' counsel knows of the applicable law and possesses the resources to commit to the vigorous prosecution on behalf of Plaintiffs and the other Class members. Plaintiffs satisfy the adequacy of representation requirements of Rule 23(a)(4).

127.   This action also meets the requirements of Rule 23(b)(2). Syngenta has acted, or refused to act, on grounds applicable to Plaintiffs and other Class members, making final injunctive relief or corresponding declaratory relief regarding the proposed Class appropriate.

128.   This action meets the requirements of Rule 23(b)(3). Common questions of law and fact, including those set forth above, exist on all Class members' claims. These common questions predominate over questions affecting only individual Class members. A class action is superior – if not the only method – for a fair and efficient adjudication of this controversy.

129.   Class treatment will permit large numbers of corn farmers similarly situated to prosecute their respective claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would produce.

130.   This action is manageable as a class action. Notice may be provided to Class members by First Class U.S. Mail and through alternative means, including publication. The

claims set forth below based on federal law will apply evenly to all proposed Class members. The

superiority and manageability requirements of Rule 23(b)(3) are satisfied.

## CLAIMS FOR RELIEF

### COUNT I
### Violations Of The Racketeer Influenced And Corrupt Organizations Act,
### 18 U.S.C. §1962(A)-(D)
### (Against All Defendants)

131.    Plaintiffs and the class repeat and reallege all allegations contained in the

Complaint as if set forth separately in this Claim for Relief.

132.    This claim arises under 18 U.S.C. §1962(a)-(d), which provides in relevant part:

> a.      It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code [18 U.S.C.S. §2], to use or invest directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

> b.      It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

> c.      It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity ....

> d.      It shall be unlawful for any person to conspire to violate any of the provisions of subsection . . . (c) of this section.

133.    Defendants knew that the premature marketing, distribution and sale of genetically

modified VIPTERA Corn Seed containing MIR-162 genetic trait — before it was approved in

China and other major U.S. Corn export markets — would directly harm U.S. growers of non-

54 – Plaintiffs' Class Action Complaint

genetically modified and non-MIR-162 genetic trait corn given the commingling and colonizing effect of GMO corn upon, and consequent contamination of, non-GMO and non MIR-162 corn, thus threatening its rejection by U.S.'s major corn export markets — China in particular – and effectively convert the U.S. Corn export market into one tainted with Syngenta's MIR-162 trait, with consequent damage to the U.S. Corn market.

134.   Nonetheless, Defendants embarked on a predatory scheme to continuously contaminate and disrupt the U.S. Corn market.   Pursuant to their scheme, Defendants aggressively began marketing, distributing and selling hybrid corn seed variety trademarked AGRISURE® VIPTERA™ which contained genetically modified trait, MIR-162. (Defendants' scheme is also referred to herein as the "RICO Scheme").   Defendants knew that many U.S. Corn export partners and nations who were not favorably inclined toward bio-engineered food or feed, or who were otherwise reluctant to embrace it, had not agreed to accept VIPTERA corn containing MIR-162.   Defendants also knew that approval processes in those countries — especially China — would take a considerable period of time extending well beyond one growing season and that China adopted a "zero tolerance" policy with respect to VIPTERA corn from the United States.

**The RICO Enterprise**

135.   Defendants Scheme was carried out by an enterprise that consisted of the Syngenta Defendants, individual defendant CEO Mack, a network of independent "Syngenta Seed Advisors" as more fully discussed below, Syngenta dealers and distributors referred to as the Dealer Channel Commercial Unit in North America, individual defendant Syngenta Seeds' President (until August 2014) David Morgan and Gavilon Grain, LLC ("Gavilson")(collectively the "Syngenta GMO Corn Seed Enterprise" or "Enterprise").   The entities constituting Syngenta

GMO Corn Seed Enterprise are associates-in-fact with respect to each other and constitute an association-in-fact.

136.   Importantly, the Defendants maintained a continuing association-in-fact with so-called "Syngenta Seed Advisors" — independent seed dealers who partner with Syngenta and support growers through facilities, service and expertise. Syngenta Seed Advisors assist farmers in their decision to choose seed and are required to be committed to promoting sales of Syngenta's products, including seeds, so that farmers grow more Syngenta seed product. Syngenta gives its Syngenta Seed Advisors the tools that they need in order to successfully promote Syngenta product and makes a substantial investment in these seed advisors. It is a significant financial commitment including equipment, training, inventory and other tools necessary for their success. These tools, training and investments are referred to as the Syngenta Seed Advisor Program.

137.   Syngenta Seed Advisors are incented to partner with Syngenta by the prospect of earning six figure incomes with Syngenta's help. Syngenta markets to potential seed advisors by informing them that they would become part of an "elite group." Syngenta Seed Advisors are charged with the goal of convincing farmers to "grow more corn" using Syngenta's seed product. Syngenta refers to the independent seed advisors collectively as its "Syngenta Seed Advisor Network." Defendant used and exploited the independent Syngenta Seed Advisors Network in order to further the RICO Scheme by contaminating U.S. Corn crops with MIR-162 genetic trait stacks.

138.   Syngenta also maintained a Dealer Channel Commercial Unit in North America that is responsible for selling Syngenta seed products to growers in the United States.

139.   The Syngenta GMO Corn Seed Enterprise engaged in two separate businesses: one to perform the legitimate functions of selling GMO corn seed products and services and another

to perform the illegitimate, deceptive and destructive functions connected with the infiltration, contamination, disruption and effective sabotaging of the non-GMO, or non-MIR-162 U.S. Corn growers and U.S. Corn market through the use of fraudulent and deceptive means, as alleged herein. Non-defendant individuals or entities who fall into any one of the categories described above furthered the business of the Enterprise and may or may not have knowingly participated in Defendants' Scheme.

140. The Syngenta GMO Corn Seed Enterprise infiltrated, contaminated and effectively colonized the U.S. Corn supply with MIR-162. The RICO scheme converted the U.S. Corn export market to "*de facto*" GMO corn status in the eyes of China. Defendants' planned contamination scheme caused class members a substantial loss of business in China and European countries, a massive reduction in the sales price of U.S. Corn in the marketplace, including the global commodities markets, and loss of revenues and profits, all of which was a foreseeable and direct consequence of Defendants' intentional actions.

141. Defendants managed, directed and controlled the activities of associates-in-fact and employees that may have been innocent and directed the activities of associates-in-fact and agents that participated in the criminal conduct and RICO scheme, or together arrived at decisions to pursue the criminal conduct and scheme.

142. As a direct and indirect result of Defendants' conduct as described above, substantial income was generated, received by and came under the control of Defendants. Defendants used that income to establish and/or operate the RICO Enterprise, which was engaged in interstate and foreign commerce. Therefore, defendants have violated 18 U.S.C. §1962(a).

143.   Defendants, through the conduct described above, acquired, maintained and exercised control over the RICO Enterprise, which was engaged in or affected interstate and foreign commerce. Therefore, defendants have violated 18 U.S.C. §1962(b).

144.   In violation of 18 U.S.C. § 1962(c), defendants have conducted or participated, directly or indirectly, in the conduct of the affairs of the RICO Enterprise through a "pattern of racketeering activity," as defined by 18 U.S.C. § 1961(5).

145.   At all relevant times, defendants were "persons" within the meaning of 18 U.S.C. §1961(3), because each was "capable of holding a legal or beneficial interest in property."

146.   The RICO Enterprise constituted a single "enterprise" or multiple enterprises within the meaning of 18 U.S.C. §1961(4), as individuals and other entities associated-in-fact for the common purpose of engaging in defendants' scheme.

147.   The RICO Enterprise was created and/or used as a tool to carry out the elements of Defendants' illicit scheme and pattern of racketeering activity. The RICO Enterprise has ascertainable structures and purposes beyond the scope and commission of defendants' predicate acts and conspiracy to commit such acts. The enterprise is separate and distinct from defendants.

148.   The RICO Enterprise has engaged in, and its activities affected, interstate and foreign commerce by soliciting, marketing, referring, advising, selling and inducing corn growers to purchase MIR-162 genetic trait corn seed and grow corn therefrom within the United States in furtherance of the RICO scheme.

149.   The RICO Enterprise actively disguised the nature of Defendants' wrongdoing and concealed or misrepresented defendants' participation in the conduct of the RICO Enterprise to maximize profits and disrupt the non GMO corn supply while minimizing their exposure to criminal and civil penalties.

150.   Each defendant exerted substantial control over the RICO Enterprise, and participated in the operation and managed the affairs of the RICO Enterprise as described herein.

151.   Defendants have committed or aided and abetted the commission of at least two acts of racketeering activity, i.e., indictable violations of 18 U.S.C. §§1341 and 1343, within the past 10 years. The multiple acts of racketeering activity which Defendants committed and/or conspired to, or aided and abetted in the commission of, were related to each other, pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity."

**Predicate Acts**

152.   Defendants' predicate acts of racketeering within the meaning of 18 U.S.C. §1961(I) include, but are not limited to:

a.      **Mail Fraud**: Defendants have violated 18 U.S.C. §1341 by sending or receiving materials via U.S. mail or commercial interstate carriers for the purpose of executing their scheme to market and sell VIPTERA and DURACADE MIR-162 trait corn seed to their scheme to infiltrate, disrupt, and contaminate the U.S. Corn Market by means of false pretenses, misrepresentations, promises, and/or omissions. The materials include, but are not limited to: advertisements, marketing brochures, purchase orders and applications, contracts, Syngenta Seed Advisor training manuals, videotapes, correspondence, sales commission payments, reports, data, summaries, statements, and other materials relating to the marketing and sale of Syngenta's VIPTERA and DURACADE trait corn seed product, including MIR-162 genetic trait.

b.      **Wire Fraud**: Defendants have violated 18 U.S.C. §1343 by transmitting and receiving materials via wire for the purpose of executing their deceptive and fraudulent scheme to obtain money on false pretenses, misrepresentations, promises, and/or omissions. The materials transmitted and/or received include, but are not limited to those mentioned in subsection (a) above

and the use of interstate and international wires to disseminate Defendants false and misleading information and material omissions in public conference calls, press releases, articles and statements published over the news wires and interviews.

153.    Many of the precise dates of Defendants' fraudulent uses of the U.S. mail and wire facilities have been deliberately hidden and cannot be alleged without access to the Defendants' books and records. Indeed, the success of Defendants' scheme depended upon witholding details of the scheme from Plaintiffs and class members. Generally, however, Plaintiffs can describe the occasions on which the predicate acts of mail and wire fraud would have occurred, and how those acts were in furtherance of a scheme.  Plaintiffs have alleged two or more occasions on which predicate acts of wire fraud specifically occurred, as more alleged above, Plaintiffs are informed and believes that there are many additional occasions when predicate acts occurred as will be learned from discovery of documents in the possession and control of Defendants.  They include thousands of communications to perpetuate and maintain the scheme, including, among other things:

c.    transmitting and receiving misleading marketing and sales materials about Syngenta's MIR-162 genetic trait corn seed products VIPTERA and DURACADE;

d.    processing purchase orders for VIPTERA and DURACADE MIR-162 genetic trait corn seed products;

e.    processing payments from purchases of VIPTERA and DURACADE corn seeds;

f.    paying and receiving commissions, bonuses or compensation or other monetary distribution or sharing for the marketing, referral and sale of VIPTERA and DURACADE corn seed products;

g.      disseminating training materials for selling VIPTERA and DURACADE corn seed products;

h.      sharing information about prospective purchasers of VIPTERA and DURACADE corn seed products; and

i.      publishing advertisements, brochures and Syngenta literature on Syngenta's websites for the purpose of inducing others to purchase Syngenta VIPTERA and DURACADE corn seed products or apply or enlist to become a Syngenta Seed Advisor.

154.    The materials sent or received by Defendants via the U.S. mail, commercial carrier, wire or other interstate electronic media, contained, *inter alia*:

a.      misrepresentations or omissions concerning the approved risk or approval status of Syngenta's VIPTERA and DURACADE containing MIR-162 trait;

b.      misrepresentations or omissions about the nature of quality of Defendants' submissions for approval by China and the reasons for China's rejection of delivery of U.S. Corn; and

c.      omissions and concealment regarding Defendants' undisclosed scheme to contaminate the U.S. Corn export supply to nations that did not approve MIR-162, or to otherwise forestall the increasing trend toward non-GMO corn.

155.    Defendants knowingly and intentionally made these misrepresentations, acts of concealment and failures to disclose so as to deceive and harm the U.S. Corn market.

156.    Plaintiffs and other class members have been injured in their business or property by Defendants' overt acts or mail and wire fraud, and by their aiding and abetting each others' acts of mail and wire fraud.

157.   In violation of 18 U.S.C. §1962(d), Defendants conspired to violate 18 U.S.C. §1962(c) as described herein. Various other persons, firms and corporations, not named as defendants in this Complaint, have participated as co-conspirators with Defendants in these offenses and have performed acts in furtherance of the conspiracy.

158.   Each Defendant aided and abetted violations of the above laws, thereby rendering them indictable as a principal in the 18 U.S.C. §§1341 and 1343 offenses pursuant to 18 U.S.C. §2.

159.   Plaintiffs and the class have been injured in their property by reason of Defendants' violations of 18 U.S.C. §1962(a) and (d).  In the absence of Defendants' violations of 18 U.S.C. §1962(a) and (d), Plaintiffs and the class would not have incurred such damages.

160.   Purchasers of VIPTERA and DURACADE corn seed products containing MIR-162 trait, to their detriment and the detriment of the U.S. Corn growers and U.S. Corn market, relied on Defendants' fraudulent misrepresentations and omissions, which were made by means of Web sites, mass mailings, newspaper advertisements, telephone calls, marketing materials and virtually uniform representations or omissions. Their reliance is evidenced by their payments made to Syngenta for corn seed products.

161.   Plaintiffs' and the class's injuries were directly and proximately caused by Defendants' racketeering activity.

162.   Defendants knew purchasers of VIPTERA and DURACADE corn seed products containing MIR-162 genetic trait relied on their representations and omissions and that U.S. corn growers would incur substantial harm and injury as a result of Defendants' fraudulent and deceptive conduct.

163.    As a direct and proximate result of Defendants' pattern of racketeering activity, Plaintiffs and all class members have suffered damages under 18 U.S.C. §1962(c).

164.    Under the provisions of 18 U.S.C. §1964(c), Plaintiffs are entitled to bring this action and to recover treble damages, the costs of bringing this suit and reasonable attorneys' fees.

165.    Defendants are accordingly liable to Plaintiffs and the class members for three times their actual damages as proved at trial plus interest and attorneys' fees.

**COUNT II**
**Public Nuisance**
**(VERSUS THE SYNGENTA DEFENDANTS)**

166.    Plaintiffs repeat and reallege all paragraphs as though fully set forth.

167.    Through the conduct alleged above, Syngenta has created a public nuisance by causing widespread contamination of the U.S. corn supply with the MIR-162 trait.

168.    This conduct constitutes an unreasonable and substantial interference with rights common to the general public.

169.    This unreasonable interference is imposed on the community at large and on a considerable diverse number of persons and entities. It arises from Syngenta's testing, growing, storing, transporting, selling, disposing, or otherwise disseminating Viptera corn: (a) without adequate precautions to prevent contamination of the U.S. corn and corn seed supplies; (b) knowing that Viptera corn would contaminate other corn; (c) knowing that this contamination would likely affect the U.S. corn and corn seed supplies; or (d) knowing that there was a substantial risk of contamination of corn and corn seed supplies earmarked for export.

170.    This interference is unreasonable because it involves a significant interference with the public health, public safety, public peace, public comfort, and/or the public convenience. It is

also unreasonable because it is proscribed by law, is continuing, and has produced a permanent or long-lasting effect.

171.  Plaintiffs and the other Class members have suffered harm caused by Syngenta's public nuisance, distinct from and different than that suffered by the general public in that, they have suffered business losses in the rejection of their crops by certain export markets (namely China); wrongful rescission of sales contracts; reduced or restricted demand for their products and services in certain markets; and reduced prices for their products and services in markets still utilizing their products and services.

172.  Syngenta knew, or should have known, that its conduct would naturally result in injuries and damages to Plaintiffs and the other Class members. Syngenta continued such conduct in reckless disregard of or conscious indifference to those consequences.

## COUNT III
### Trespass To Chattels
### (VERSUS THE SYNGENTA DEFENDANTS)

173.  Alternatively and without prejudice to the RICO claim for Relief, Count I above, Plaintiffs repeat and realleges all paragraphs as though fully set forth.

174.  Plaintiffs and the other Class members entered into contracts for the sale of corn.

175.  Syngenta, by testing, growing, storing, transporting, selling, disposing of, or otherwise disseminating VIPTERA has contaminated the U.S. corn supply.

176.  The contamination of the corn supply from the MIR-162 trait has negatively impaired the condition, quality, or value of the U.S. corn supply.

177.  Plaintiffs and the other Class members, due to the loss of markets and the decline of corn prices, have been damaged in an amount to be proven at trial as a direct and proximate result of Syngenta's wrongful conduct.

178.   Syngenta's actions, including the growing, testing, storing, transporting, selling, disposing, or otherwise disseminating VIPTERA corn, which led to the market-wide contamination, have harmed Plaintiffs' and the other Class members' economic interests.

## COUNT IV
### Common Law Negligence
### (VERSUS THE SYNGENTA DEFENDANTS)

179.   Alternatively and without prejudice to the RICO claim for relief, Count I above, Plaintiffs repeats and reallege all paragraphs as though fully set forth.

180.   Regarding its testing, growing, storing, transporting, selling, disposing, or otherwise disseminating VIPTERA corn, Syngenta had a duty to use its professional expertise and exercise the degree of skill and learning ordinarily used under the same, or similar, circumstances by a person or entity in Syngenta's business.

181.   Syngenta breached this duty by failing to exercise the requisite degree of care in testing, growing, storing, transporting, selling, disposing, or otherwise disseminating VIPTERA corn to prevent it from contaminating the U.S. corn supply.

182.   Upon information and belief, Syngenta breached its duty by failing to notify the appropriate regulatory bodies and the public in a timely fashion after it first learned of the contamination of the U.S. corn supply with MIR-162.

183.   The rejection by China of U.S. corn could not have occurred without Syngenta's negligence in prematurely releasing VIPTERA corn seed without prior approval of major export partners because the commercialization of VIPTERA was solely under its management and control. Syngenta made the decision to commercialize VIPTERA knowing that it would likely contaminate the U.S. corn supply. VIPTERA in fact contaminated the U.S. corn supply, which could not have occurred without Syngenta's negligence. Syngenta had exclusive control over the

commercialization of VIPTERA and this unapproved genetically modified trait could not have contaminated the U.S. corn supply without a lack of proper care.

184.    The damages incurred by Plaintiffs and the other Class members were, or should have been, foreseen by Syngenta, as Syngenta was uniquely positioned to understand the risks of releasing VIPTERA corn, including but not limited to, the near certainty of cross pollination, risks of intentional or unintentional commingling of VIPTERA corn with non- VIPTERA corn, China's zero tolerance policy for MIR-162, and China's large – and growing – U.S. corn import market.

185.    Syngenta breached its duties, as alleged above, and also breached the requisite standard of care owed to all foreseeable plaintiffs, and was therefore negligent.

186.    Syngenta's breaches are a direct and proximate cause of the injuries and damages sustained by Plaintiffs and the other Class members.

## COUNT V
### Strict Liability – Products Liability
### (VERSUS. THE SYNGENTA DEFENDANTS)

187.    Plaintiffs repeat and reallege all paragraphs as though fully set forth.

188.    Syngenta was, and continues to be, a supplier of VIPTERA corn.

189.    Syngenta has in the past and continues to manufacture, sell, or otherwise distribute Viptera corn.

190.    VIPTERA corn was used in a manner reasonably anticipated.

191.    As a direct and proximate cause of the defective and unreasonably dangerous condition of VIPTERA corn as it existed when Syngenta supplied it, Plaintiffs and the other Class members have sustained injuries and damages as alleged above.

192.    Syngenta knew, or should have known, that its conduct would naturally or probably result in injuries and damages to Plaintiffs and the other Class members.

193.   Syngenta's VIPTERA corn is the direct and proximate cause of the injuries and damages sustained by Plaintiffs and the other Class members.

194.   Nevertheless, Syngenta continued such conduct in reckless disregard and conscious indifference to those consequences.

## COUNT VI
### Strict Liability – Failure To Warn
### (VERSUS THE SYNGENTA DEFENDANTS)

195.   Plaintiffs repeat and reallege all paragraphs as though fully set forth.

196.   Syngenta is strictly liable to Plaintiffs and the other Class members because of its failure to warn about the dangers of planting, growing, harvesting, transporting, or otherwise using VIPTERA corn.

197.   Syngenta sold VIPTERA corn in its business, as alleged above.

198.   When planted, grown, harvested, transported, or otherwise utilized as reasonably anticipated and without knowledge of its characteristics, VIPTERA corn was unreasonably dangerous at the time of its sale.

199.   Syngenta did not give an adequate warning of the danger of planting, growing, harvesting, transporting, or otherwise utilizing VIPTERA corn.

200.   Upon information and belief, VIPTERA corn was used in a reasonably anticipated manner.

201.   Plaintiffs and the other Class members suffered injury and damages as a direct and proximate result of Syngenta's failure to provide an adequate warning regarding the dangers of planting, growing, harvesting, transporting, or otherwise using VIPTERA corn when VIPTERA corn was sold.

202.   Syngenta knew, or should have known, that its conduct would naturally or probably result in injuries to Plaintiffs and the other Class members.

203.   Nevertheless, Syngenta continued such conduct in reckless disregard of or conscious indifference to those consequences.

**COUNT VII**
**Tortious Interference with Prospective Business Relationships**
**(VERSUS THE SYNGENTA DEFENDANTS)**

204.   Plaintiffs repeat and reallege all paragraphs as though fully set forth.

205.   Plaintiffs had a business relationship with various grain elevators, co-ops, and supply companies whereby Plaintiffs would sell corn to such companies. This business relationship was memorialized by invoices, receipts, and other documents showing a consistent course of sales.

206.   Plaintiffs had a reasonable expectation of economic gain resulting from the relationship with these grain elevators and supply companies, and Plaintiffs reasonably expected to continue to sell corn from his farms to such companies. Plaintiffs rightfully maintained the expectation that such business relationships would continue.

207.   Defendants knew that Plaintiffs and other farmers had business relationships with such grain elevators and supply companies in the normal chain of crop export and sales, and Defendants fully knew that Plaintiffs and other farmers expected these business relationships to continue.

208.   Despite this knowledge, Defendants made and caused to be made representations that deceived and/or continue to deceive farmers and other consumers whether grain elevators and other supply companies would accept VIPTERA and DURACADE corn. These misrepresentations, which included a "Plant With Confidence" fact sheet on Syngenta's website

and other various forms, stated that VIPTERA corn is or would imminently be approved for import into China. Because of these representations, Plaintiffs and other Class members reasonably believed that growing VIPTERA and DURACADE was commonplace and that their ability to sell such corn would not be affected.

209.  Defendants interfered with these prospective future business relationships through its conscious decision to bring VIPTERA and DURACADE corn to the market. Syngenta knew, or should have known, that the releasing MIR-162 corn would lead to the contamination of all U.S. corn shipments and prevent U.S. corn from being sold to export markets such as China and many other countries.

210.  Syngenta's release of MIR-162 corn destroyed the export of U.S. corn to China and other countries and caused depressed prices for all domestic corn producers. Plaintiffs and other Class members cannot sell their corn to grain elevators and supply companies at the price they reasonably expected to receive.

211.  Defendants intentionally interfered with Plaintiffs' prospective business relationships; and Syngenta knew the interference was certain or substantially certain to occur because of its conduct in releasing MIR-162 corn into the U.S. market.

212.  Plaintiffs have been proximately damaged and continue to be damaged because of Defendants' interference.

213.  Defendants' tortious conduct serves as a direct and proximate cause of the injuries and damages sustained by Plaintiffs and the other Class members.

## REQUEST FOR RELIEF

Plaintiffs, individually and on behalf of all others similarly situated, respectfully requests that the Court enter judgment in his favor and against Defendants:

(a)     That the Court certify the Class under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), and designate Plaintiffs as Class Representative and their counsel as Class Counsel;

(b)     That the Court enter preliminary and permanent injunctions providing that Syngenta shall be enjoined from selling, marketing, distributing, or otherwise disseminating DURACADE corn product featuring MIR-162, until such time that DURACADE containing MIR-162 "trait stack" has been approved for import to China;

(c)     That the Court enter a judgment finding:

a.      Defendants' conduct violates 18 U.S.C §1962 (c) and (d).

b.      Syngenta's release of *Viptera* corn constitutes a public nuisance.

c.      Syngenta's release of *Viptera* corn and the contamination of the U.S. corn supply constitutes a trespass to chattels.

d.      Syngenta's release of *Viptera* corn was negligent.

e.      Syngenta is strictly liable for damages caused because of the release of *Viptera* corn.

f.      Syngenta fraudulently misrepresented the approval status of *Viptera* corn.

g.      Defendants Syngenta tortiously interfered with Plaintiffs' prospective business relationship by releasing MIR-162 corn into the U.S. market.

(d)     That the Court award monetary damages, including compensatory relief, to which Plaintiffs and the proposed Class members are entitled to, in an amount to be determined at trial but exceeding $75,000.

(e)     That, statutory treble, and/or punitive damages as to Counts for which they are available under the applicable law be awarded in favor of Plaintiffs and the Class and against the Defendants.

(f)     That attorneys fees be awarded against Defendants.

(g)     That the Court award prejudgment interest, the costs of this action, and such other and further relief as the Court deems proper.


## DEMAND FOR JURY TRIAL

Plaintiffs demands a trial by jury on all claims so triable.

Dated: January 14, 2015

Respectfully Submitted,

Scott E. Poynter
Will T. Crowder
Corey D. McGaha
**EMERSON POYNTER LLP**
The Rozelle-Murphy House
1301 Scott Street
Little Rock, AR  72202
Phone:  (501) 907-2555
Fax: (501) 907-2556
scott@emersonpoynter.com
wcrowder@emersonpoynter.com
cmcgaha@emersonpoynter.com

John G. Emerson
**EMERSON POYNTER LLP**
830 Apollo Lane
Houston, TX  77058
Phone:  (281) 488-8854
Fax:     (281) 488-8867
jemerson@emersonpoynter.com

Daniel Bacine
**BARRACK, RODOS & BACINE**
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Phone: (215) 963-0600
Fax: (215) 963-0838
dbacine@barrack.com

Stephen R. Basser
**BARRACK, RODOS & BACINE**
600 West Broadway, Suite 900
San Diego, CA 92101
Phone: (619) 230-0800
Fax: (619) 230-1874
sbasser@barrack.com

**ATTORNEYS FOR PLAINTIFF**